**STATE of Tennessee, Appellee,**

v.

**William James SPAWR, Appellant.**

Supreme Court of Tennessee,
at Jackson.

June 27, 1983.

John C. Dice, Turner, Dice & Ferguson, April Rose Wyss Ferguson, Turner, Dice & Ferguson, Memphis, for appellant.

William M. Leech, Jr., Atty. Gen., Rhona J. Cartwright, Gordon W. Smith, Asst. Atty. Gen., Nashville, for appellee.

## OPINION

FONES, Chief Justice.

Defendant was indicted for assault with intent to commit first degree murder and pled guilty to an attempt to commit that offense. In December 1980, he was sentenced to not less than nor more than one year in the penitentiary, to be served at the Shelby County Penal Farm.

In January 1981, his petition for a suspended sentence was denied by the trial judge, on the ground of the seriousness of the offense and "to act as a deterrent to others." The Court of Criminal Appeals affirmed.

On July 12, 1980, at about 1:30 a.m., defendant was paying his bill at a Steak and Egg Restaurant in Memphis when he got involved in a verbal altercation that accelerated into a brief physical encounter. Defendant went to the parking lot and obtained from his vehicle a pistol that he said was there because he had recently visited a target range to practice. He went back inside the restaurant and according to defendant: "I had it down by my side, and I asked him what did he say he was going to do to me, and he spun off the stool again, he grabbed me by the throat, and I showed him the pistol at that time and we scuffled for it, and the first round went off and it went through my arm, and I managed to get away from him. And it was just reac-

tion, Your Honor. And I shot him." The victim was shot in the chest but recovered from the wound.

Defendant was thirty-two years old at the time of the hearing. He was born in Memphis. His family moved to Tucson, Arizona because he had asthma, but after five years they returned to Memphis. He graduated from a Memphis public school and had one year of college at Memphis State University. He entered the U.S. Army in 1967 and served in the Vietnam War. For his participation in combat he was awarded three bronze stars with "V" for Valor in Action, the Vietnamese Cross of Gallantry, the Army Commendation Medal, the Combat Infantryman's Badge and the Purple Heart. After the war he spent about six months in Memphis working at the Woolco Department Store. He spent the next year in California and in Colorado, and then returned to Memphis. He learned the trades of painting and vinyl hanging and alternated between contracting for himself and working for other contractors. Shortly before the offense involved here, he had three feet of his colon removed at the veteran's hospital in Memphis.

Three witnesses and defendant testified at the hearing on the petition for suspended sentence. The three witnesses were active in a veteran's rehabilitation center, which opened in Memphis on May 1, 1980. The center concentrates on the readjustment counselling of Vietnam veterans and their families. The program was initiated by Max Cleland, the Director of the Veterans Administration, a disabled Vietnam veteran. Defendant sought their assistance in July 1980, shortly after the shooting. Defendant's testimony and that of all three witnesses established beyond doubt that defendant was thoroughly shaken, disturbed, and genuinely sorry for his conduct on that occasion and that he sincerely sought rehabilitation.

The principal witness was Dr. Matt Jaremko, a clinical psychologist who was a professor of psychology in the doctoral program at the University of Mississippi and a consultant to the veteran's center's Viet-nam rehabilitation program in Memphis. In that capacity he participated in rap group sessions and worked with individual veterans. Dr. Jaremko testified that defendant was suffering from a condition, frequently seen in Vietnam veterans, that he called Delayed Stress Syndrome. He said that the American Psychiatric Association characterized it as Post-Traumatic Stress Disorder. He explained the basis of the problem, in response to the question, "What distinguishes a Vietnam combat veteran in this syndrome from people involved in other wars?", as follows:

"I think the difference is the nature of the war. In the Vietnam war there were a number of differences between that combat and previous combats; most specifically, the fact that the combatants were not ideologically invested in the war. That is to say, they weren't fighting for their home land, and they were fighting in midst of a civil war, and they never knew who was on their side. It was a constant kind of unknown. It was the fact that they were afraid of—They never knew what to be afraid of, and that's probably the most fear provoking thing. And that's coupled with the fact that when these combatants returned home from Vietnam they—in many times—were not received well, because of the fact that the war wasn't popular, which made them unable to discuss—talk about, relate their experiences with other people. And many of these people— Many of these combatants have held inside of them experiences that are best discussed and processed in one way or another. And if they aren't processed and discussed then the combatant, or the individual soldier, will develop what I've come to call a values vacuum, a questioning of whether anything is valuable, a disenchantment with regular—with the values most of us hold as pertinent in daily life. And we see this manifested in the drifting—the aimless drifting, the combativeness, the anger, the alcohol abuse, and a number of other symptoms, depression, social alienation."

Doctor Jaremko listed the symptoms of the Delayed Stress Syndrome as "high levels of anxiety, depression, guilt, social alienation, explosive aggression, fear of loss of control, nightmares, flashbacks, and obsessional thinking about the war experiences." He said that defendant did not present all of those symptoms but that he had a sufficient number to include him in that diagnostic category.

The treatment is called an Anger Management Stress Program which Dr. Jaremko described as follows:

"This is a program in which we teach the person behavioral and cognitive or thinking options to deal with provoking—anger provoking situations. With the patient we discuss what kinds of options can be used in typical provocations that he's faced with, and then we develop a repertoire, or a list of those options, and then we try to provoke him and get him to use them in the therapeutic situation.

All of the witnesses connected with the program testified that defendant was faithful in attendance and making excellent progress with the program. Doctor Jaremko estimated that defendant would need psychiatric counselling for a period of one to two years; that incarceration would "deteriorate him for two reasons.... The first reason is that he has made remarkable strides in the treatment—He's been one of the most successful individuals I've ever treated in six years of clinical practice.... And the other reason is that he would be exposed to another frustration in his life that would, I think, deteriorate the values that we have helped him reconstruct in the treatment program."

On several occasions during the hearing, the trial judge asked witnesses whether if defendant had "shot your relative, would you be here today making these excuses for him." We are of the opinion that the trial judge failed to give defendant's evidence of his efforts to rehabilitate himself the weight, faith, and credit to which it was entitled. In any event, it has now been two years since the hearing in this case and defendant has been on bond. We think it is appropriate to remand this case to the trial court for a new probationary hearing. If defendant's rehabilitation has been successful he should be granted probation on such terms as the trial judge may impose. If his rehabilitation has not been successful, probation should be denied.

COOPER, BROCK, HARBISON and DROWOTA, JJ., concur.