**STATE of Tennessee, Appellee,**

v.

**David Willard PHIPPS, Jr., Appellant.**

Court of Criminal Appeals of Tennessee, at Jackson.

May 11, 1994.

Lionel R. Barrett, Jr. and John G. Oliva, Nashville, for appellee.

Charles W. Burson, Atty. Gen. & Reporter, Rebecca L. Gundt, Asst. Atty. Gen., Nashville, G. Robert Radford, Dist. Atty. Gen. and Vicki S. Snyder, Asst. Atty. Gen., Huntingdon, for appellee.

## OPINION

WHITE, Judge.

Appellant, David Willard Phipps, Jr., appeals as of right from his conviction for the first-degree murder of Michael Presson. The state did not seek the death penalty in this case, and Phipps was sentenced to life in prison.

Appellant raises four issues on appeal:

1. Whether the trial court's comment and refusal to charge the jury on post-traumatic stress disorder as requested by the defendant was error;

2. whether the evidence is sufficient to prove the element of premeditation beyond a reasonable doubt;

3. whether the trial court erred by instructing the jury of the "pitfalls" of expert testimony; and

4. whether the trial court erred in refusing to allow defendant to present character evidence and by refusing to instruct the jury on good character at defendant's request.

We hold that the jury instructions, taken as a whole, failed to fairly and adequately submit the issues and applicable law to the jury and amounted to an inappropriate comment on the evidence. The judgment in this case is reversed and the case is remanded for a new trial.

### Facts

In the fall of 1990, the appellant, David Phipps, a career soldier, was sent to Saudi Arabia as part of the forces in Desert Shield and Desert Storm. His military occupational specialty was that of a nuclear-chemical/bio-logical-chemical warfare coordinator with an emphasis on decontamination. He was responsible for providing appropriate chemical measures and counter-measures and served in a front line unit that was one of the first to enter Iraq. Appellant received a bronze star for his exemplary service in Desert Storm.

While appellant was in Saudi Arabia, his wife, Marcie Ann, entered into a relationship with Michael Presson. Throughout the course of their twelve-year marriage, the appellant had been aware of Marcie's numerous relationships with other men.[1] He was, how-

---

1. Marcie Phipps testified that she had previously been unfaithful to her husband six or seven times.

ever, unaware of the existence of Michael Presson until he returned to the United States in April, 1991. Although Marcie Phipps[2] corresponded with her husband while he was overseas and spoke with him by telephone, she did not reveal that she was involved with another man.

Within a month of appellant's return to the States, his wife informed him that she had been living with Presson while he was overseas and that she wanted a divorce. She then moved her possessions out of their home. Marcie Phipps continued to communicate with appellant, visited him occasionally to discuss financial matters, shared meals, and had sexual relations with him. Appellant accompanied her to a trial in which she was a plaintiff. Appellant implored her to move back home, but she refused. Approximately a week after his wife left him, appellant attempted suicide.

On Friday, May 31, 1991, Marcie Phipps and appellant met at their home to work on some bills. She gave the appellant a check for her portion of the bills.[3] They had lunch together and shared a bottle of wine. Marcie Phipps left about 3:00 p.m., returned to the home she shared with the victim, prepared his supper, and laid down until 10:00 p.m. when she left for work. Marcie Phipps' work schedule, known to the appellant, was 11:00 p.m. to 7:00 a.m. During her shift that evening the victim visited on her break around 2:55 a.m. and stayed until 4:00 a.m.

At approximately 4:45 a.m. on June 1st, several of the victim's neighbors were awakened by the sounds of a struggle. At trial, they described repeated thuds that sounded as though someone were hitting a tree or the pavement with a board. The neighbors heard cries for help, grunting, and moaning.

In the dark, one neighbor saw "something" being dragged across the yard to a vehicle.

In response to a disturbance call at 4:51 a.m., Officer Damon Lowe, a Henry County deputy sheriff, went to the scene. He found a white Oldsmobile Cutlass parked in the driveway and a white male, the appellant, sitting on the driver's side. The keys were in the ignition. The victim, who was still alive, was lying on the back seat of the car.[4] He appeared to have been brutally and savagely beaten. He was wearing only black underwear and was covered with blood. Lying on top of the victim was a blood-covered wooden stick, probably an ax handle, and one black glove. A second black glove was found on the floor of the back seat. The ax handle had a price tag on it. Testing revealed no fingerprints. The gloves were standard issue military work gloves.[5]

When the deputy found appellant in the car, his pants, shirt, and shoes were covered with blood, he was sweating profusely, and he appeared to be very exhausted. He was wearing a knife in a sheath. At first, the appellant said that as he was driving down the road he saw a fight and had stopped to take the injured man to the emergency room. A few minutes later, he told the officer that he thought the man's name was David Presson and that his wife had been living with Presson.

Appellant's truck was located in a gravel lot across the street from the victim's home and was parked behind some school buses. The truck could not be seen from the victim's house but the view from the truck was of the highway on which Marcie Phipps would return home from work. In the back of the truck were a shovel, a gas can, a tool box, a face shield, and a pair of work gloves.[6] A knapsack propped against the front steps of

---

**2.** At the time of trial, Marcie Phipps had remarried and was known as Marcie Primm.

**3.** The check was written on a joint account belonging to Marcie Phipps and the victim. She inked out the victim's name before giving the check to the appellant but did not ink out the address.

**4.** The victim died at approximately 7:00 a.m. at the Henry County Hospital from head injuries.

**5.** The victim's sister testified that the victim was a member of the National Guard and had been for several years. The actual source of the gloves was never determined at trial.

**6.** Bruce Parks, a friend of the appellant's, testified that he had taken down a number of trees in his yard and that he and the appellant had cut up the branches. The items in the truck were to assist in shredding the branches into mulch.

the house contained a weight bar, nylon rope, garbage bags, and duct tape.

The appellant did not deny beating Presson to death. He testified that he went to the house to wait for his wife to return from work in the hope that he could convince her to leave Presson and come back to him. However, at some point, he approached the house carrying the knapsack.[7] According to the appellant, Presson was watching television. The appellant knocked on the screen door and entered. Presson jumped up, threw a glass at the appellant, and ran out a side door. Presson went to his car and Phipps thought he was going to leave. However, Presson returned to the house with a stick in his hand. Presson told Phipps that Marcie was no longer his and to leave. According to Phipps, Presson threatened him with the stick. Phipps grabbed the stick and a struggle ensued. Although Phipps said that he had no clear memory of the events that followed, he had no doubt that he struck many blows to the body and head of Presson. He remembered moving the body and being in the car with the body.

On cross-examination, Richard Hixson testified that two weeks before the murder, he, the appellant and a third party had discussed a murder in which the body was hidden in the woods and burned.

Four experts testified as to the appellant's mental state. Dr. Samuel Craddock and Dr. Jackson B. White testified for the state and Dr. William D. Kenner and Dr. Patricia Auble testified for the appellant. All four experts agreed that David Phipps was competent to stand trial and that he was not legally insane at the time of the murder. However, all four experts also agreed that the appellant was suffering from major depression and post-traumatic stress syndrome.

The appellant testified to his experiences during Operation Desert Storm which includ-ed his killing a young Iraqi soldier outside the camp and the suicide of an officer. Soldiers who served with the defendant testified to the constant tension created by being on the front line and the anxiety caused by Iraqi scud attacks.[8] They also recounted two incidents in which the appellant had behaved in an unusual manner.[9]

Dr. Craddock testified that appellant's depression was "of a sufficient level to significantly affect his thinking, reasoning, judgement, and emotional well-being," and that the "components of his post-traumatic stress disorder may have lessened his threshold or made him more sensitive to defending himself and protecting himself and increased the likelihood of him over-reacting to a real or perceived threat." Dr. White, the other state expert, agreed that appellant's anxiety was sufficient to significantly affect his thinking and reasoning. Dr. Kenner, testifying for the defense, stated that while the defendant was not insane, he was unable to make a calculated decision to murder someone. While Dr. Auble, a psychologist, expressed no opinion on appellant's ability to formulate intent, she agreed with the other three experts that the appellant was suffering from major depression, severe anxiety, and post-traumatic stress syndrome. All experts expressed the opinion that the appellant was truthful and that he was not dissembling or faking any symptoms.

## I. WAS THE TRIAL COURT'S REFUSAL TO CHARGE THE JURY ON POST–TRAUMATIC STRESS DISORDER ERROR?

Appellant's first allegation of error is that the jury instruction given by the trial court on the weight and application of evidence of post-traumatic stress disorder was improper and constitutes reversible error. We agree.

---

7. Appellant testified that the items in the knapsack were for his own suicide which he intended to threaten if his wife refused to return to him.

8. These witnesses were unable to confirm that appellant had killed the young Iraqi in hand to hand combat. Appellant said that he told only one person of the experience, a sergeant who later died of a heart attack.

9. In addition to failing to report to his superiors the incident with the young Iraqi, appellant threw his gun into the sand when ordered to remain in Iraq after the rest of his unit moved out. Witnesses viewed those actions as totally out of character for the appellant who was considered an outstanding soldier with an exemplary military record.

At trial, the appellant did not deny committing the murder, nor did he plead insanity. His theory of defense was that at the time of the killing he could not and did not formulate the specific intent required to commit first-degree murder.

The trial court rejected appellant's request for a jury instruction based on his theory of the case [10] and, after giving the pattern instructions on the elements of first-degree murder, including premeditation and deliberation, second-degree murder, and voluntary manslaughter, issued the following instruction:

> The defendant contends that he was suffering from mental conditions known as post traumatic stress disorder, and major depression at the time of the commission of the criminal offense giving rise to this case. I charge you that post traumatic stress disorder and major depression are not defenses to a criminal charge. Insanity may be a defense, however, the defendant makes no claim that he was insane at the time of the killing giving rise to this case.

Immediately following the above-quoted instruction, the court instructed the jury that:

> The state must have proven beyond a reasonable doubt the required culpable mental state of the defendant before finding him guilty of the offense of first degree murder, or either of the two lesser included offenses earlier set out for you in this charge. As you were earlier instructed the killing must have been an intentional, deliberate act done with premeditation for the defendant to be guilty of first degree

murder. As to either of the two lesser included offenses, the state must have proven beyond a reasonable doubt that the act was either intentionally or knowingly committed, again as you were earlier instructed.

■■■■ "[A] defendant has a constitutional right to a correct and complete charge of the law." *State v. Teel*, 793 S.W.2d 236, 249 (Tenn.1990) (citations omitted). A trial judge should properly instruct the jury on the law governing issues raised by the evidence introduced at trial. *State v. McAfee*, 737 S.W.2d 304, 308 (Tenn.Crim.App.1987). When the trial judge gives instructions that correctly, fully, and fairly set forth the applicable law, it is not error to refuse to give a special requested instruction. *State v. Bohanan*, 745 S.W.2d 892, 897 (Tenn.Crim.App. 1987), *perm. to appeal denied*, (Tenn.1988). We must review the entire charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. *In re Estate of Elam*, 738 S.W.2d 169, 174 (Tenn. 1987).

Our courts have recognized that special instructions should be given if "fundamental" to the case. Where the charge is one that is "fundamental in nature" and "essential to a fair trial," failure to give the charge may result in error. *Teel*, 793 S.W.2d at 249; *Souey v. State*, 81 Tenn. (13 Lea) 472, 480 (1884) ("[P]arties to a state prosecution ... have the right not only to a correct charge of the general principles of law applicable to the character of the case, but to a specific

---

**10.** Defendant's Requested Jury Instruction No. 1, which was rejected by the trial court, read as follows:

The jury is further instructed that the defense has submitted evidence that the Defendant was suffering from a mental condition known as post-traumatic stress disorder. This evidence should be considered by you, specifically in reference to whether or not the Defendant possessed the necessary premeditation or malice necessary for him to be convicted of Murder in the First or Second Degree.

The jury is further instructed that you should consider this condition and the expert testimony thereto in relation to the crime of Voluntary Manslaughter as it relates to whether or not the mental condition of the Defendant further ob-

scured his reasoning at the time of the offense and also affected his ability to be reasonably and adequately provoked.

While this evidence may not establish a defense wherein the Defendant would be found not guilty of any offense, it may be considered by you in deliberating upon the necessary elements of Murder in the First Degree, Murder in the Second Degree, and Voluntary Manslaughter, as are herein explained to you.

As I have further instructed you, should you find that the necessary elements of any of these grades of homicide are not present, the Defendant must be acquitted as to that charge and you may consider evidence of post-traumatic stress disorder, along with other relevant evidence in arriving at your verdict.

charge, if requested, of the law applicable to the particular facts of the case.").

■ The essence of appellant's defense was that at the time of the killing he lacked the requisite mental state for first-degree murder. In support of that defense he offered expert and lay testimony which, without contradiction, indicated that he was suffering from post-traumatic stress syndrome and major depression. The court instructed the jury that the evidence offered did not constitute a defense and refused to instruct the jury, as appellant requested, that the evidence could be considered on the issue of proof of requisite mental state. While the court's statement was technically accurate, we are called upon to determine whether the instruction, taken as a whole, fairly advised the jury.

In order to resolve this issue, we must answer two questions: first, whether under Tennessee law the jury is permitted to consider this type of testimony on the issue of intent; and secondly, if so, whether the jury instructions, taken as a whole, had the probable effect of excluding evidence of appellant's mental state from the jury's consideration of the element of specific intent?

For the reasons discussed below, we are compelled to answer both questions in the affirmative. Consequently, we reverse and remand for a new trial but offer no opinion on the substance of appellant's defense.

A. Does Tennessee law permit the consideration of evidence of mental state for the purpose of negating the element of specific intent?

■ Fortunately neither the state nor the appellant has, as is often the case, wrongly characterized appellant's contentions as a "diminished capacity" defense. In actuality, diminished capacity is not a defense that absolves the accused from culpability; rather, it is a rule of evidence which allows the introduction of evidence to negate the existence of specific intent when a defendant is charged with a specific intent crime. "*John-*

*son v. State*—Diminished Capacity Rejected As A Criminal Defense," 42 Md.L.Rev. 522, 524 (1983) (hereinafter 42 Md.L.Rev. at ——, *supra*). The use of testimony to negate the existence of mens rea, as appellant attempted, is not an affirmative defense and does not result in an acquittal unless there is a failure to establish intent for the offense and for all of its lesser-included counterparts. *United States v. Pohlot,* 827 F.2d 889 (3d Cir.1987), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988). Tennessee case law is sparse on the scope and applicability of diminished capacity evidence. Consequently, we turn first to the wealth of authority from other jurisdictions for an understanding of the concept.

As is sometimes the case, determining what diminished capacity is not is a helpful starting point. It is not an absolute or affirmative defense. Though frequently confused, diminished capacity is not synonymous with diminished responsibility. The distinctions are significant. Diminished capacity most often refers to evidence negating the mens rea element of a crime, such as premeditation or malice. *Id.* at 903; *See United States v. Frisbee,* 623 F.Supp. 1217, 1220 (N.D.Cal.1985). A second type of diminished capacity allows a defendant to show a lack of not only the specific intent required to commit the offense, but a lack of total capacity to form any mens rea as well. Because only extraordinary circumstances exist in which a defendant would not have the capacity to form any mens rea, *Pohlot,* 827 F.2d at 903, this type of diminished capacity is more academic than functional.[11] In either form, however, diminished capacity is never used as a justification or an excuse for a crime. Rather, it is an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but may well be guilty of a lesser one. *United States v. Cameron,* 907 F.2d 1051, 1067 (11th Cir.1990).

Diminished responsibility, on the other hand, is a pure defense. It is based on the theory that as a result of a mental disease or

---

**11.** In the United States, mens rea is generally satisfied by any showing of purposeful activity. Arenella, "The Diminished Capacity and Dimin- ished Responsibility Defenses: Two Children of a Doomed Marriage," 77 Colum.L.Rev. 827, 833 (1977).

defect, the accused, though guilty, is less responsible for his acts. It allows the jury to "mitigate the punishment of a mentally disabled but sane offender in any case where the jury believes that the defendant is less culpable than his normal counterpart who commits the same criminal act." *Pohlot*, 827 F.2d at 904 (quoting Arenella, *supra* at 829). Though rare in the United States, an example of the diminished responsibility defense is found in *People v. Wolff*, 61 Cal.2d 795, 40 Cal.Rptr. 271, 394 P.2d 959 (1964). There, the California court held that the defendant was not guilty of first-degree murder because his mental abnormality prevented him from realizing "the enormity of the evil." *Id.*, 40 Cal.Rptr. at 287, 394 P.2d at 975.[12]

Equally distinguishable and significantly different from diminished capacity and diminished responsibility is the insanity defense which focuses on the defendant's responsibility for his criminal acts and, if established, acquits and excuses the defendant from punishment. A defendant pleading diminished responsibility does not seek relief from punishment by justification or excuse, but seeks to be punished for a lesser offense which he generally admits committing. In contrast, diminished capacity focuses on a defendant's capacity to commit a specific intent crime, and, if established, does not excuse punishment, but results in punishment instead for the general intent crime defendant was capable of committing. Evidence to demonstrate such a lack of specific intent is not equivalent to evidence to establish diminished responsibility, *Cameron*, 907 F.2d at 1061, or insanity, *Pohlot*, 827 F.2d at 892.

Thus, a defendant claiming diminished capacity contemplates full responsibility, but only for the crime actually committed. *State v. Padilla*, 66 N.M. 289, 347 P.2d 312 (1959). Diminished capacity is based on the presen-

tation of evidence aimed at negating specific intent. "Properly understood, it is ... not a defense at all but merely a rule of evidence." *Pohlot*, 827 F.2d at 897. *See also* 42 Md.L.J. at 523, *supra;* Morse, *Undiminished Confusion in Diminished Capacity*, 75 J.Crim.L. & Criminology 1, 7–9 (1984).

The American Law Institute does not mention the term "diminished capacity" but states that:

> Evidence that the defendant suffered from a mental disease or defect shall be admissible whenever it is relevant to prove that the defendant did or did not have the state of mind which is an element of the offense.

A.L.I. Model Penal Code § 4.02(1) (Official Draft 1962). The Comment to Section 4.02 explains that:

> [i]f states of mind such as deliberation or premeditation are accorded legal significance, psychiatric evidence should be admissible when relevant to prove or disprove their existence to the same extent as any other relevant evidence.

*Id.*, Comment to § 4.02.

Overwhelmingly, those courts that have carefully considered the issue have held that expert testimony pertaining to the capacity to form a specific intent is admissible for consideration by the jury. Such evidence is deemed admissible even in federal courts where the Insanity Defense Reform Act of 1984 greatly restricts the use of the traditional insanity defense and abolishes the use of "diminished capacity" and "diminished responsibility" defenses in federal courts.[13] *See United States v. Moran*, 937 F.2d 604 (4th Cir.1991); *United States v. Cameron*, 907 F.2d 1051 (11th Cir.1990); *United States v. Newman*, 889 F.2d 88 (6th Cir.1989); *United States v. Brown*, 880 F.2d 1012 (9th Cir.1988); *United States v. Bartlett*, 856 F.2d 1071 (8th Cir.1988); *United States v. Hood*,

---

**12.** By referendum, this defense was abolished in California.

**13.** The Insanity Defense Reform Act provides that the use of mental disease or defect does not constitute an affirmative defense, unless the defendant "was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17 (1989). Legislative history indicates that this language was "intended to insure that the insanity defense [was] not improperly resur-

rected in the guise of showing some other affirmative defense, such as ... diminished responsibility or some similarly asserted state of mind which would serve to excuse the offense and open the door ... to needlessly confusing psychiatric testimony." S.Rep. No. 98–225, 98th Cong.2d Sess. 229 (1984), reprinted in 1984 U.S.Code Cong & Ad.News 3182, 3411 (emphasis added).

857 F.2d 1469 (4th Cir.1988); *United States v. Twine,* 853 F.2d 676 (9th Cir.1988); *United States v. Pohlot,* 827 F.2d 889 (3rd Cir. 1987); *United States v. Gold,* 661 F.Supp. 1127 (D.D.C.1987); *United States v. McBride,* 786 F.2d 45 (2d Cir.1986). *But cf. United States v. White,* 766 F.2d 22 (1st Cir.1985).

The position of a majority of the United States Courts of Appeals is summed up by the pre-Insanity Defense Reform Act holding of the Court of Appeals for the District of Columbia:

> [E]xpert testimony as to a defendant's abnormal mental condition may be received and considered, as tending to show, in a responsible way, that defendant did not have the specific mental state required for a particular crime or degree of crime—even though he was aware that his act was wrongful and was able to control it, and hence was not entitled to complete exoneration.

*United States v. Brawner,* 471 F.2d 969, 998 (D.C.Cir.1972).[14] The court reasoned that when an offense "requires a specific intent that cannot be satisfied merely by showing that defendant failed to conform to an objective standard ... 'the stated condition of a defendant's mind ... is ... a proper subject for consideration, inquiry, and determination by the jury.'" *Id.* at 998–99 (quoting *Bishop v. United States,* 107 F.2d 297, 301 (D.C.Cir. 1939)).

Numerous state courts have taken a similar stance on the issue of diminished capacity.[15] A typical example is the holding of the Colorado Supreme Court in *Battalino v. People:*

> The question to be determined is not whether defendant was insane, but whether the homicidal act was committed with deliberation and premeditation.... A claim of insanity cannot be used for the purpose of reducing a crime of murder in the first degree to murder in the second degree or from murder to manslaughter. If the perpetrator is responsible at all in this respect, he is responsible in the same degree as a sane man; and if he is not responsible at all, he is entitled to an acquittal in both degrees. However, ... evidence of the condition of the mind of the accused at the time of the crime, together with the surrounding circumstances, may be introduced, not for the purposes of establishing insanity, but to prove that the situation was such that a specific intent was not entertained—that is, to show absence of. any deliberate or premeditated design.

---

**14.** The *Brawner* court emphasized that the use of the term "diminished responsibility" in diminished capacity cases was inappropriate explaining that:

> Our doctrine has nothing to do with "diminishing" responsibility of a defendant because of his impaired mental condition, but rather with determining whether the defendant had the mental state that must be proved as to all defendants.

471 F.2d at 998.

**15.** *Barrett v. State,* 772 P.2d 559 (Alaska App. 1989); *People v. Stress,* 205 Cal.App.3d 1259, 252 Cal.Rptr. 913 (1988); *Hendershott v. People,* 653 P.2d 385 (Colo.), *cert. denied,* 459 U.S. 1225, 103 S.Ct. 1232, 75 L.Ed.2d 466 (1982); *State v. Burge,* 195 Conn. 232, 487 A.2d 532 (1985); *McCartney v. State,* 510 So.2d 1157 (Fla.App. 1987); *State v. Nizam,* 7 Haw.App. 402, 771 P.2d 899 (1989); *State v. Clokey,* 83 Idaho 322, 364 P.2d 159 (1961); *State v. Gramenz,* 256 Iowa 134, 126 N.W.2d 285 (1964); *Todd v. Commonwealth,* 716 S.W.2d 242 (Ky.1986); *State v. Hill,* 242 Kan. 68, 744 P.2d 1228 (1987); *Commonwealth v. Blanchette,* 409 Mass. 99, 564 N.E.2d

992 (1991); *People v. Smith,* 119 Mich.App. 91, 326 N.W.2d 434 (1982); *People v. Carter,* 585 S.W.2d 215 (Mo.App.1979); *State v. McKenzie,* 186 Mont. 481, 608 P.2d 428, *cert. denied,* 449 U.S. 1050, 101 S.Ct. 626, 66 L.Ed.2d 507 (1980); *Starkweather v. State,* 167 Neb. 477, 93 N.W.2d 619 (1958); *Fox v. State,* 73 Nev. 241, 316 P.2d 924 (1957); *State v. Oglesby,* 122 N.J. 522, 585 A.2d 916 (1981); *State v. Talley,* 103 N.M. 33, 702 P.2d 353 (1985); *State v. Allen,* 322 N.C. 176, 367 S.E.2d 626 (1988); *People v. Tabarez,* 113 A.D.2d 461, 497 N.Y.S.2d 80 (1985); *State v. Nichols,* 3 Ohio App.2d 182, 209 N.E.2d 750 (1965); *Commonwealth v. Terry,* 513 Pa. 381, 521 A.2d 398 *cert. denied,* 482 U.S. 920, 107 S.Ct. 3198, 96 L.Ed.2d 685 (1987); *State v. Correra,* 430 A.2d 1251 (R.I.1981); *Cowles v. State,* 510 S.W.2d 608 (Tex.Crim.1974); *LaVasseur v. Commonwealth,* 225 Va. 564, 304 S.E.2d 644 (1983), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984); *State v. Smith,* 136 Vt. 520, 396 A.2d 126 (1978); *State v. Ferrick,* 81 Wash.2d 942, 506 P.2d 860, *cert. denied,* 414 U.S. 1094, 94 S.Ct. 726, 38 L.Ed.2d 552 (1973); *State v. Simmons,* 172 W.Va. 590, 309 S.E.2d 89 (1983); *State v. Klimas,* 94 Wis.2d 288, 288 N.W.2d 157 (App.1979).

*Battalino v. People,* 118 Colo. 587, 199 P.2d 897, 901 (1948) (emphasis in original). Thus, it is clear that the vast majority of jurisdictions that have addressed the issue, allow evidence of a defendant's mental state to negate the existence of mens rea.

In Tennessee, the law is not so clear. Without any detailed analysis, Tennessee courts have on occasion stated that "the defense of diminished capacity is not recognized in Tennessee." *State v. Taylor,* 645 S.W.2d 759, 763 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1982); *State v. Croscup,* 604 S.W.2d 69 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1980). However, our opinions have never fully analyzed the misnamed "diminished capacity" defense nor its relationship to the admissibility of evidence tending to negate specific intent.

An example is our opinion in 1980 affirming a first-degree murder conviction in *State v. Croscup,* 604 S.W.2d 69 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1980). There, the defendant relied on an insanity defense which the jury rejected. The trial court instructed the jury in accord with the requirements of *Graham v. State,* 547 S.W.2d 531 (Tenn.1977); however, defendant's request for special instructions on diminished capacity was denied. *Croscup,* 604 S.W.2d at 72. The *Croscup* court stated:

> Although [defendant] concedes that these requests do not reflect present Tennessee law, he requests that we adopt that doctrine. This we decline to do. The instructions, as a whole, were fair and correct.

*Id.* The opinion does not recite the wording of the instructions used and does not cite case law or other precedent for its conclusion. *Id.*

In *State v. Taylor,* 645 S.W.2d 759 (Tenn. Crim.App.1982), this court cited only *Croscup* in refusing a diminished capacity instruction in an aggravated sexual battery and armed robbery case, stating again that diminished capacity was not recognized as a defense in Tennessee. 645 S.W.2d at 763.

Several years after those decisions, the Tennessee Supreme Court alluded to the lack of reasoned analysis and paucity of precedent on the subject. *State v. Taylor,* 771 S.W.2d 387, 398 (Tenn.1989). In *Taylor,* the defen-

dant pled insanity. Testimony of defense experts was contradicted by the state's witnesses, *id.* at 391, and the jury found the defendant guilty of first-degree murder. *Id.* at 392. The defendant requested a jury instruction "to the effect that even though not insane, he could still be guilty of a lesser offense if because of mental impairment he was unable to develop the necessary elements of malice and premeditation." *Id.* at 398. The Tennessee Supreme Court, in referring to this instruction, said "[t]his is the so-called limited defense of diminished capacity, which it is commonly said is not recognized in Tennessee." *Id.* As authority for this proposition, the Court cited the 1982 *Taylor* decision.

However, the Tennessee Supreme Court did not uphold the rejection of the instruction on the basis that diminished capacity was not recognized in Tennessee. Rather the Court deemed the instruction given to be sufficient. While not accepting defendant's argument that refusing to charge on diminished capacity meant that the jury either had to find the defendant not guilty by reason of insanity or guilty of first-degree murder, the court held:

> The trial court fully charged the jury on all the elements of first degree and second degree murder and all lesser included offenses, and the absence of an instruction on "diminished capacity" did not preclude the jury's finding defendant guilty of a "lesser offense."

*Id.* (emphasis added).

More recently, in *State v. Shelton,* 854 S.W.2d 116 (Tenn.Crim.App.1992), *perm. to appeal denied,* (Tenn.1993), this court held that an allegation of diminished capacity "allows a defendant to introduce competent evidence, usually expert testimony, of his impaired mental condition to show that he was incapable of forming a criminal intent, even though he was not insane." *Id.* at 122. Moreover, we recognized that the blanket statements in *Croscup* and *Taylor* rejecting the doctrine were subject to dispute. In reference to the Tennessee Supreme Court's holding in the later *Taylor* decision, we stated: "[w]e view the Supreme Court's statements in *Taylor* as less than a ringing en-

dorsement of this Court's blanket rejection of the diminished capacity defense and we view *Davis [v. State]* as having continued vitality." *Id.*[16]

*Davis v. State*, a 1930 decision, is the first in a line of Tennessee cases that provide a basis for concluding that evidence to negate the element of intent is admissible in Tennessee. In *Davis*, the Supreme Court reduced a conviction from second-degree murder to manslaughter holding that the conviction for murder was not sustained by the proof. *Davis v. State*, 161 Tenn. 23, 28 S.W.2d 993, 997 (1930). Davis, while suffering from the delusion that the victim had "debauched" his wife, gunned down the victim. The *Davis* Court reasoned that an accused who was suffering from an insane delusion, like a person acting under extreme excitement and passion, could not be capable of malice, an essential element of murder. *Id.* at 996. Thus, while the defendant's mental state did not excuse his crime, as the mental state of insanity would, it did serve to reduce the offense for which he could be convicted. The reasoning in *Davis* was approved in *Overton v. State*, 165 Tenn. 575, 56 S.W.2d 740, 741 (1933).

*Davis* was also relied upon in *Drye v. State*, 181 Tenn. 637, 184 S.W.2d 10 (1944). In *Drye*, a case remarkably similar to the case at bar, the Supreme Court reversed a first-degree murder conviction because of insufficient evidence and remanded the case for a new trial. *Id.*, 184 S.W.2d at 14. Drye was a veteran of World War I who, after his honorable discharge as "mentally unsound," was in and out of various government hospitals. *Id.* at 10. At trial an expert testified that Drye suffered from a "circular" depression, meaning that he would have periods of remission when he could and did act normally. *Id.* at 11. Devoted to his wife of many years, Drye became despondent when his wife, described as, "a woman without regard for her marital vows," moved in with another man. *Id.*

On the day of the murder, Drye's wife made it quite clear that she would not return to him. Defendant went to the home of a friend and borrowed a pistol. He told another friend that he was going to kill both his wife and her paramour. By subterfuge, he discovered where his wife was staying. He hired a taxi and, entering the house by the rear door, he shot his wife two times. She ran into the yard next door where she collapsed. She died shortly after her arrival at the hospital. *Id.* at 11–12.

Although Drye raised the insanity defense, the jury found that he was sane and convicted him of first-degree murder. The Supreme Court upheld the finding of the jury with respect to Drye's sanity, stating, however, that although "the defendant is not entitled to an acquittal of criminal responsibility, we are not of opinion that a conviction of first degree murder is sustained by the facts." *Id.* at 12.

Although couched in the language of its day, the *Drye* Court was clearly relying on the mental state of the defendant to negate the requisite specific intent for first-degree murder. The Court considered at length the distinguishing, essential elements of first-degree murder and quoted with approval a passage from an earlier case defining passion: "[a]ny of the emotions of the mind known as anger (q.v.), rage, sudden resentment, or terror, rendering the mind incapable of cool reflection." *Id.* at 13 (quoting *Winton v. State*, 151 Tenn. 177, 268 S.W. 633, 637 (1925)). The Court refused to decide whether the accused was guilty of either second-degree murder or manslaughter, stating only that:

[w]hile conceding ... but not deciding, that reason had not been so far dethroned as to render the killing excusable, we think it clear that the defendant did not act with that coolly formed premeditated deliberation which is an essential characteristic of murder in the first degree.

*Id.* at 12–13. In other words, evidence of defendant's mental state at the time of the

---

**16.** *Shelton's* skeptical view of the blanket rejection in our prior cases dealing with diminished capacity was noted in a more recent case. *State v. Larry Kelly*, 868 S.W.2d 733 (Tenn.Crim.App. 1993), in which the trial judge apparently gave a "favorable" instruction similar to that requested here.

crime, though insufficient to sustain his in-sanity defense, negated the mens rea required for first-degree murder.

Both *Davis* and *Drye* were cited with approval in *State v. Thornton,* 730 S.W.2d 309 (Tenn.1987). In *Thornton,* defendant was convicted of first-degree murder in the killing of his wife's lover. A majority of the Supreme Court affirmed the jury's finding that the accused was sane but reduced the conviction to manslaughter because "the necessary elements of malice and premeditation were not demonstrated ... and ... the appellant acted under legally sufficient provocation." *Id.* at 315. However, Justice Drowota, concurring in part and dissenting in part, viewed the evidence as sufficient to negate premeditation and deliberation but insufficient to negate malice. *Id.* at 318 (Drowota, J., dissenting).

■ This entire line of cases from *Davis* to *Shelton,* though frequently not using the term "diminished capacity," supports the conclusion that evidence of an accused's state of mind at the time of the offense is admissible in Tennessee to negate the existence of the requisite element of intent.

Moreover, Tennessee courts' reaction to the introduction of similar evidence confirms this conclusion. As was noted in *Shelton,* we have long admitted evidence of voluntary intoxication to negate the state of mind requirement. *State v. Shelton,* 854 S.W.2d 116, 121 (Tenn.Crim.App.1992), *perm. to appeal denied,* (Tenn.1993). Voluntary intoxication, generally considered socially unacceptable, is within the control of the defendant. On the other hand, most conditions which give rise to diminished capacity are not volitional and not controlled by the defendant. 42 Md. L.Rev. at 533, *supra.*

> Neither logic nor justice can tolerate a jurisprudence that defines the elements of an offense as requiring a mental state such that one defendant can properly argue that his voluntary drunkenness removed his capacity to form the specific intent but another defendant is inhibited from a submission of his contention that an abnormal mental condition, for which he was in no way responsible, negated his capacity to form a particular specific intent, even

though the condition did not exonerate him from all criminal responsibility.

*United State v. Brawner,* 471 F.2d 969, 999 (D.C.Cir.1972).

■ In considering the admissibility under Tennessee law of evidence pertaining to diminished capacity, the 1989 revision of the criminal code is not inconsequential. The revision, among other things, abolishes common-law defenses. Tenn.Code Ann. § 39–11–203(e)(2) (1991 Repl.). The applicable general and affirmative defenses are set out in the statutes. Tenn.Code Ann. §§ 39–11–501 — –621 (1991 Repl.). Diminished capacity is not among those enumerated.

■ That omission is significant. First, it establishes without doubt that Tennessee, like the majority of states and federal circuits that have considered the issue, does not accept diminished capacity as a defense, that is, diminished capacity is not a means "to defeat a criminal charge." Black's Law Dictionary 377 (5th ed. 1979). Since the code sets out defenses and not rules of evidence, we conclude that the omission does not contradict the conclusion reached in Tennessee case law that evidence of diminished capacity is relevant not to excuse or defeat a criminal charge but to lessen the offense when it serves to negate mens rea.

We are aware that the legislature chose to codify the "non-defense" of voluntary intoxication but do not find that the codification of one "non-defense" infers the nonexistence of others. Clearly, neither diminished capacity nor voluntary intoxication are true defenses. *See* Tenn.Code Ann. § 39–11–203(e)(1) (1991 Repl.) (differentiating between "ground of defense" and "defense" negating element of offense); § 39–11–503(a) (1991 Repl.) (intoxication "is not a defense ... [but] is admissible ... if it is relevant to negate a culpable mental state."). Since involuntary intoxication which results in a lack of "substantial capacity either to appreciate the wrongfulness of ... conduct or to conform that conduct to the requirements of the law" is a defense, it was necessary to include intoxication in the defenses provision of the code. Tenn.Code Ann. § 39–11–503(c) (1991 Repl.). For clarification the non-defense component

of intoxication, voluntary intoxication, was addressed and clearly identified as "not a defense," but deemed admissible evidence "if relevant to negate a culpable mental state." Tenn.Code Ann. § 39–11–503(a) & (c) (1991 Repl.).

We conclude that the failure of the legislature to likewise list diminished capacity as a non-defense in the defense provisions is inconsequential. The criminal code does not purport to establish rules of relevance. Our evidentiary rules have that function. *See generally* Tenn.R.Evid. 101. Consequently, when the general law provides that "[n]o person may be convicted of an offense unless ... [t]he culpable mental state required ... is proven beyond a reasonable doubt," Tenn. Code Ann. § 39–11–201(a)(2) (1991 Repl.), evidence tending to make the existence of that mental state "more probable or less probable" is relevant. Tenn.R.Evid. 401. As such, it is admissible. Tenn.R.Evid. 402.

To find otherwise would deprive a criminal defendant of the right to defend against one of the essential elements of every criminal case. In effect, then, such a finding would deprive the defendant of the means to challenge an aspect of the prosecution's case and remove the burden of proof on that element in contravention of constitutional and statutory law. U.S. Const.Amends. 5, 6, & 14; Tenn.Code Ann. § 39–11–201(a) (1991 Repl.). While the law presumes sanity it does not presume mens rea. Due process requires that the government prove every element of an offense beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 363–64, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970).

Defendants have a right to present competent and reliable evidence in support of their defenses. Arbitrary rules that deny that right have been stricken. Consequently, "a rule barring evidence on the issue of mens rea may be unconstitutional [17] [if] criminal liability [is determined] in part through subjective states of mind." *United States v. Pohlot,* 827 F.2d 889, 901 (3d Cir.1987), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988). We conclude, therefore, that the passage of the 1989 criminal code and the abolition of common-law defenses within that code does not affect the rationale and conclusions reached in the pre-Act Tennessee cases [18] pertaining to the use of diminished capacity evidence.

Thus, the weight of precedent in Tennessee as well as the well-reasoned opinions of the federal circuit courts and of our sister states lead us to conclude that evidence, including expert testimony, on an accused's mental state, is admissible in Tennessee to negate the elements of specific intent, including premeditation and deliberation in a first-degree murder case.[19]

B. Did the jury instructions taken as a whole have the probable effect of excluding evidence of defendant's mental state from the jury's consideration on the issue of intent?

Appellant contends that the jury instruction given by the trial court which stated that post-traumatic stress syndrome and major depression were not defenses to a criminal offense in effect precluded the jury from considering the expert testimony relating to his mental state on the element of intent. We agree.

██ In criminal cases, there is a positive duty upon a trial judge to give the jury a complete charge on the law applicable to the facts of the case. *State v. Harris,* 839 S.W.2d 54, 73 (Tenn.1992). A defendant has a right to have every issue of fact raised by the evidence and material to his defense sub-

**17.** At least one court has found the practice of accepting psychiatric evidence on other issues but excluding it to negate mens rea to be unconstitutional. *Hughes v. Mathews,* 576 F.2d 1250 (7th Cir.), *cert. denied,* 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978).

**18.** Though *Shelton* was a 1992 case, the crime occurred in April, 1989, and was, therefore, not affected by the new Act. *State v. Shelton,* 854 S.W.2d 116, 118 (Tenn.Crim.App.1992), *perm. to appeal denied,* (Tenn.1993).

**19.** Given the facts of this case and in view of Tennessee's restriction of evidence of voluntary intoxication to specific intent cases, it is not necessary for this court to determine whether such testimony is admissible to negate mental states other than specific intent or to determine its applicability to non-murder cases.

mitted to the jury upon proper instructions by the trial court. *Casey v. State*, 491 S.W.2d 90, 94 (Tenn.Crim.App.), *cert. denied*, (Tenn.1972). A defendant is also entitled to an instruction upon request which outlines the defense theory of the case.[20] *See Souey v. State*, 81 Tenn. (13 Lea) 472 (1884). Nothing short of a "clear and distinct exposition of the law" satisfies a defendant's constitutional right to trial by jury. *State v. McAfee*, 737 S.W.2d 304 (Tenn.Crim.App.1987) (quoting *Strady v. State*, 45 Tenn. 300, 307 (1868)).

In this case, the instructions as a whole did not give a clear and distinct exposition of the law in Tennessee. Although the trial court correctly instructed the jury on the elements of first-degree murder, second-degree murder, and voluntary manslaughter, the comment on the non-existence of the "defense" of post-traumatic stress disorder did not clearly reflect the state of the law in Tennessee. Moreover, it suggested that the evidence was impertinent. As such it served to exclude from jury consideration defendant's theory of the case.

Appellant did not rely on an insanity defense or on any affirmative defense.[21] The cornerstone of appellant's case was that he did not have the requisite intent to commit first-degree murder. Virtually all of his testimony was directed toward negating the specific intent element of first-degree murder. While those schooled in the law may be able to discern the difference between considering expert testimony on defendant's mental condition as a complete defense to the charge and considering it to determine whether the requisite mental state has been proved, that subtlety would be lost on most jurors absent clear instructions.

In *United States v. Pohlot*, 827 F.2d 889 (3d Cir.1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988), the defendant was charged with conspiracy to commit first-degree murder. While the main defense was insanity, the defense offered considerable psychiatric testimony to negate the existence of intent. In closing, counsel argued the absence of mens rea. *Id.* at 894. After defining insanity, the trial court instructed the jury that "[m]ental disease or defect does not otherwise constitute a defense.... A mental disease or defect, other than one which renders a Defendant unable to appreciate the nature or quality or wrongfulness of his acts, ... does not ... constitute a defense." *Id.* at 895.[22] The trial court did give a general instruction on mens rea.

The Third Circuit concluded that the instructions given suggested that evidence of mental abnormality was relevant only to the issue of insanity. *Id.* Since evidence of mental condition was admissible under the Insanity Defense Reform Act of 1984 for the purpose of negating specific intent, the court's instruction was capable of confusing and misleading the jury. *Id.* at 895. Thus, the Third Circuit concluded that "the instructions as a whole had the probable effect of excluding evidence of Pohlot's mental abnormality from the jury's consideration of mens rea." *Id.*

The fear expressed by the Third Circuit is even more likely in this case. Defendant did not plead insanity. The judge reiterated that fact to the jury simultaneously with his advice that post-traumatic stress disorder and major depression did not constitute defenses. A rational juror would therefore most likely conclude that the evidence on mental state should not be considered since the defendant did not claim the defense to which it was relevant and since the mental states themselves were not defenses.

The trial court's instruction that post-traumatic stress disorder and major depression were not defenses was likely to confuse and

---

**20.** A trial court should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law. *Mitchell v. Smith*, 779 S.W.2d 384 (Tenn. App.), *perm. to appeal denied*, (Tenn.1989).

**21.** "The term "affirmative defense" has generally referred to defenses that must be affirmatively raised by the defendant and that are based on *justifications* and *excuses* for conduct that is oth-

erwise criminal." W. LaFave and A. Scott, Criminal Law, 152 (1st ed. 1972).

**22.** The trial court rejected defendant's request for a special instruction that defendant's mental state could be considered in determining whether mens rea had been proved. *Pohlot*, 827 F.2d at 894.

mislead the jury. Moreover, the instruction in this case did not simply limit the use of the evidence. It suggested that the evidence was of no consequence since appellant was not pleading insanity. The instruction effectively removed the appellant's defense theory, which is an accepted one in Tennessee, from the jury's consideration.[23]

Our Tennessee courts have allowed consideration of testimony on post-traumatic stress disorder for many years. *See e.g., State v. Spawr,* 653 S.W.2d 404 (Tenn.1983) (testimony on delayed stress disorder considered on issue of probation); *Edwards v. State,* 540 S.W.2d 641 (Tenn.1976) (defendant diagnosed schizophrenic after service in Vietnam); *Harvey v. State,* 225 Tenn. 316, 468 S.W.2d 731 (1971) (defendant suffering from a disassociative state caused by pressure and stress of Vietnam.). The Supreme Court has deemed the weighing of expert testimony on post-traumatic stress disorder to be a function of the jury. *State v. Cone,* 665 S.W.2d 87 (Tenn.1984).

In the case at bar, since the appellant did not plead an insanity defense or offer other defenses, his only defense was an attack on the sufficiency of the evidence of intent as required for the various degrees of murder and manslaughter. He had a constitutional right to offer relevant evidence to challenge that element of the state's proof. If the expert testimony offered by appellant on that issue could not be used to challenge proof of intent, then that evidence was irrelevant and should have been excluded. Obviously that is not the situation as the evidence was relevant and admissible for consideration by the jury. The judge's instruction served to obviate consideration by the jury of relevant evidence essential to the defense theory and amounted to an impermissible comment on the evidence. Tenn. Const. Art. 6, § 9.

The instructions on the elements of the offenses and reasonable doubt are insufficient in this instance to overcome the effect of this erroneous instruction. Taken as a whole, the jury charge given by the trial court does not provide the clear and distinct exposition of the law required in Tennessee and as such interferes with the right to trial by jury. *State v. McAfee,* 737 S.W.2d 304 (Tenn.Crim.App.1987). The judgment of the trial court must, therefore, be reversed and the case remanded for a new trial.

## II. APPELLANT'S REMAINING ISSUES

Giving our ruling on the jury instruction issue, we need not address in detail the other issues raised by appellant. However, three remaining matters, perhaps relevant on retrial, must be considered.

**A.** Must the trial court instruct the jury that expert testimony may be considered in determining whether the requisite mental state existed?

Tennessee law does not require the trial judge to instruct the jury that expert testimony may be considered in determining whether the requisite mental state existed. Our holding is not so broad. We hold only that, in the circumstances of this case, it was error to issue an instruction that suggested that testimony on defendant's mental defects could not be considered in determining whether the requisite mental state was proved.

This case differs markedly from two recent decisions by this Court. In both *State v. Shelton,* 854 S.W.2d 116 (Tenn.Crim.App. 1992), *perm. to appeal denied,* (Tenn.1993), and *State v. Rutherford,* 876 S.W.2d 118 (Tenn.Crim.App.1993), this court found that a failure to instruct on diminished capacity was not error. In *Rutherford,* the court held that no special instruction on the effect of defendant's mental retardation as it affected his ability to form the culpable mental state was required. Rather, mental retardation was one of several circumstances the jury could consider in determining if the defendant possessed the required mental state. *State v. Rutherford, supra,* at 121. In *Shelton,* a confusing instruction which did not limit the

---

**23.** The Third Circuit suggested that an instruction which precluded the jury from considering evidence of mental state to ascertain whether the requisite mental state was proven would not be sanctioned by the United States Supreme Court. *Pohlot,* 827 F.2d at 901 (citing *Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952)).

jury's inquiry to the rule in *Davis*, was not required in light of the adequate instructions given. 854 S.W.2d at 122–23.[24]

▪ In neither *Shelton* nor *Rutherford* was there an instruction implying that the jury should disregard the evidence entirely. While nothing in Tennessee law requires that a trial court instruct the jury that expert testimony may be considered in determining whether the appropriate mental state exists, a trial judge must not issue instructions that will have the probable effect of excluding relevant, probative, and admissible evidence from jury consideration on the element of intent.

B. Should a trial court instruct the jury that expert testimony is "beset with pitfalls and uncertainties?"

The appellant objected to a portion of the jury instruction on expert witnesses. That instruction, taken from the second edition of the Tennessee Pattern Jury Instructions, advised the jury that expert testimony "should be received with caution" since it was "beset with pitfalls and uncertainties." T.P.I.Crim. 37.31 (2d ed. 1985). Appellant contends that the instruction found in the third edition which eliminates those phrases should have been used instead. T.P.I.Crim. 42.02 (3d ed. 1992).

The Tennessee pattern jury instructions are just that, pattern instructions. They are not sanctioned by the Supreme Court or the legislature. *State v. Dulsworth*, 781 S.W.2d 277 (Tenn.Crim.App.), *perm. to appeal denied*, (Tenn.1989). It remains "the responsibility of the trial judge to prepare the jury instructions [and to] revise[ ] or supplement[ ] [previously printed forms] if necessary in order to state the applicable law fully and accurately." *State v. Martin*, 702 S.W.2d 560, 564 n. 5 (Tenn.1985).

This court has recently analyzed the propriety of the expert witness instruction at issue here. In *State v. Donald Givens*, No. 01C01–9110–CC–00312, 1993 WL 31710 (Tenn.Crim.App., Nashville, Feb. 11, 1993),

*perm. to appeal denied*, (Tenn.1993), the instruction's historical background was detailed. It originates apparently from an 1894 Supreme Court case which remains valid law. *See Wilcox v. State*, 94 Tenn. 106, 28 S.W. 312, 314 (1894); *Atkins v. State*, 119 Tenn. 458, 105 S.W. 353, 356 (1907); *State v. Howse*, 634 S.W.2d 652, 657 (Tenn.Crim. App.), *perm. to appeal denied*, (Tenn.1982). Notwithstanding its validity the Supreme Court has disallowed similar instructions that "discriminate too strongly" against expert testimony. *Union Traction Co. v. Anderson*, 146 Tenn. 476, 242 S.W. 876, 882 (1922); *Fisher v. Travelers' Ins. Co.*, 124 Tenn. 450, 138 S.W. 316, 328–29 (1911).

▪ While the decisions consistently hold that the "received with caution" language is appropriate, the more recent decisions omit the "beset with pitfalls and uncertainties" language. *State v. Donald Givens, supra*, slip op. at 5. Thus, we concluded in *Givens*, and reiterate now, that "trial courts should not charge the jury that the testimony of expert witnesses is 'beset with pitfalls and uncertainties.' " *Id.*, slip op. at 6.

C. Must the trial court allow the appellant to present character evidence before appellant testifies?

The appellant attempted to introduce evidence of his character through witnesses during his case in chief before he testified. The state objected that appellant's character was not an issue "[u]ntil [he] takes the stand." The court sustained the objection prohibiting appellant's witnesses from testifying about appellant's character until and unless appellant testified. This ruling was in error.

▪ Rule 404 of the Tennessee Rules of Evidence and its federal counterpart reflect a compromise of the traditional view that character evidence is inadmissible. In several criminal contexts the rule provides for the limited introduction of character evidence. One of those limited exceptions allows the defendant in a criminal case to introduce

---

**24.** The instruction in *Shelton* suggested that passion or provocation and lack of perception auto-

matically negated malice.

"[e]vidence of a pertinent character trait." Tenn.R.Evid. 404(a)(1). That evidence may be introduced through the testimony of character witnesses who testify about a pertinent character trait or through the testimony of the defendant testifying personally. Neil Cohen, Don Paine, Sara Sheppeard, Tennessee Law of Evidence § 404.3, at 126–27 (2d ed. 1990); McCormick on Evidence § 191, at 348 (J. Strong ed., 4th ed. 1992). It is not necessary for the defendant to take the stand before being allowed to present evidence of a pertinent character trait. *Id.* Character evidence pertaining to the defendant may be presented by others but must be in the form of reputation or opinion testimony. Tenn. R.Evid. 405(a). Thus, the inquiry for the court is not whether defendant has testified but is whether the evidence offered concerns a "pertinent character trait."

In the context of any criminal case the accused is entitled to offer evidence of "good character ... as tending to show that [the accused] would not commit a crime" even if the accused does not testify. "[I]f testifying as a witness [the accused] may show good character and reputation in support of the proposition that [the accused's] testimony is entitled to full faith and credit by the jury." *McKinney v. State*, 552 S.W.2d 787, 790 (Tenn.Crim.App.), *cert. denied*, (Tenn.1977) (emphasis added).

 Quite separate from the issue of the introduction of character evidence as substantive proof is its introduction for impeachment purposes under Rule 608. That rule allows reputation and opinion evidence of a witness' untruthfulness and as to truthfulness after attack. Tenn.R.Evid. 608(a). When the witness being impeached is the accused, procedural safeguards are required. *Id.* at (b)(3).

In the case before us appellant argues that he should have been allowed to introduce evidence of his character for truthfulness

since "the State mounted a continuous attack on [his] credibility." Thus, it appears that appellant was offering "evidence of truthful character ... after ... attack" under Rule 608(a). Under Rule 608 appellant has a right to present that evidence by any competent means. That right is not contingent upon his relinquishment of his Fifth Amendment privilege.

Similarly even if the court were to find that appellant's character for truthfulness had not been attacked so as to allow supportive character evidence under Rule 608, appellant was still entitled to present opinion or reputation evidence concerning a "pertinent character trait"[25] through character witnesses or through his own testimony under Rule 404. Introduction of evidence of a "pertinent character trait" would open the door to rebuttal of the claimed trait through prosecution evidence.

We have discussed this issue only for clarification should it become necessary at retrial. In the context of this case, the court's ruling, though incorrect, offers no relief to appellant. No proffer of the excluded evidence was made by the appellant by which we can determine whether the evidence offered was admissible as either "pertinent character trait" evidence pursuant to Rule 404 or as rehabilitative evidence of truthfulness after attack under Rule 608. Further, the appellant eventually chose to testify but still declined to present the character evidence. Thus, appellant has failed to provide an adequate record for appellant review of this issue.

**D. Was there sufficient evidence to convict the appellant of first-degree murder?**

Because we have reversed this case and remanded for a new trial, we need not engage in a lengthy discussion of the sufficiency of the evidence. We have reviewed the evidence in the light most favorable to the prosecution as we are required to do and

---

**25.** What is a pertinent character trait depends on the nature of the case.

Wigmore and others have said that at common law the accused could introduce either general good character or evidence of the specific trait relevant to the crime charged.... McCormick, on the other hand, insisted that only a minority of the courts permitted the use of general good character and that the majority view was that only specific traits were admissible.

Charles Wright & Kenneth Graham, Jr., Federal Practice and Procedure: Evidence § 5236, at 382–83 (1978).

have concluded that the evidence is more than sufficient to sustain the verdict. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Tenn.R.App.P. 13(e).

## CONCLUSION

The judgment of the trial court is reversed, and the case is remanded for new trial in accordance with the rulings in this opinion.

TIPTON, J., concurs.

ALLEN R. CORNELIUS, Jr., Special Judge, files dissenting opinion.

ALLEN R. CORNELIUS, Jr., Special Judge, dissenting.

I respectfully dissent from the scholarly opinion authored by Judge White and in which Judge Tipton concurred.

This trial began with the defendant's plea of not guilty.

In my opinion the direct evidence overwhelmingly established a most brutal and atrocious homicide. The evidence points unerringly to this having been an intentional, deliberately premeditated killing of another human being. T.C.A. § 39-13-202.

As an intermediate court judge, I accept the holding of *State v. Brown*, 836 S.W.2d 530 (Tenn.1992) which requires that to establish first degree murder a premeditated killing must also have been done deliberately, with coolness and reflection, with more than a split-second intention.

This record establishes that on May 10, 1991 the defendant's wife informed him that she was leaving him and that she was interested in someone else. It does not appear that she directly told her husband the name or address of her paramour with whom she was living.

Mrs. Phipps testified that she had met the defendant at their former home on May 15, 1991 to work on their prior financial affairs. She agreed to return at the end of the month and on May 31 arrived at defendant's home in Dover about 1:00 in the afternoon to pay bills and have lunch. She and the victim had opened a joint checking account on which she wrote the defendant a check inking out the victim's name but leaving visible the address. She left at 3:00 p.m. after commenting that she had to go home to rest before working from 11:00 p.m. until 7:00 a.m. The defendant asked her to stay but she refused. She testified further that the victim visited her during her break at work and left for home at 4:00 a.m.

The testimony of Larry Flood, Elaine Flood, and Mary Solmon was consistent that between 4:00 and 5:00 a.m. June 1, 1991 they were awakened by activities at the house across the street from the Floods and next door to Mary Solmon. According to these neighbors there was an intense fight at the house identified as the victim's. While it was not yet daylight, Mr. Flood related that he was able to see through the door into the far corner of the living room (of the victim's house) and saw two figures fighting. He saw them run out the door, one ahead of the other. The first man was yelling, "help me, someone please help me." The two went to the Solmons' home. Mr. Flood could not see the Solmons' door but heard "beating on the porch,—and hollering and screaming,— know,—then it quit,—then,—"

Mrs. Flood called the Sheriff's office and relayed what her husband was seeing and hearing. She too heard the blows on two occasions and described the sound as if hitting a tree or the pavement.

Mrs. Solmon placed the time at about 5:30 a.m. when a man began beating on her door saying, "help, help, he is beating me to death." This lasted about ten minutes, she took her children to the rear of the house. When the police arrived she went out and saw the front of her house. At the trial she was able to identify a picture of her bloody front door.

The first officer to arrive on the scene was Damon Lowe. As he approached the house he looked to the house where he observed a white male entering the driver's side of a white Oldsmobile parked in the driveway. He pulled into the driveway and noticed that the front door and porch of the house directly to his left were covered with blood. The white car had blood on its front door and all

he could see was one person, later identified as Phipps.

Officer Lowe asked Phipps what was going on. Phipps replied that there was a gentleman in the car that he was trying to take to the emergency room,—that he (Phipps) had been driving down the road and saw a fight,—that someone was beating this man, and he stopped to help him. Officer Lowe looked in the car and saw the man later identified as Mr. Presson. Presson was naked except for a pair of black bikini underwear. He was covered with blood and some grass. Officer Lowe could see Mr. Presson's forehead and that a portion of his brain was exposed. Lying on top of his leg and hip area was a wooden stick like a sledge-hammer handle which was split and under one black glove covered with blood. Later the other glove was found on the back floorboard of the Oldsmobile. Lowe asked Phipps about his automobile and was told it was beside the house, but Lowe could not see another vehicle. The officer interrupted his investigation to check on the ambulance, then he again asked Phipps if he had any idea of the victim's name. Phipps stated that his last name was Presson, that his wife had been living with him. Phipps was also covered with blood, sweating profusely and appeared exhausted. He did not appear intoxicated and was coherent.

Officer Lowe and an off-duty officer found Phipps' truck parked on a graveled lot beside some school buses. It was not parked in a manner that one could see the front of the Solmons' house or where one would stop on the side of the road to offer help.

Investigator Riggins, of the Sheriff's office testified consistently with the other state witnesses. He was questioned more in detail regarding the location of the defendant's truck and the victim's home. Mr. Riggins also described the items found inside the defendant's truck.

Mr. Lindy Walker and his wife, Patsy Walker, lived next to the Solmons. They were awakened at approximately 5:00 a.m. by the activities at Mrs. Solmon's. Their testimony was consistent with that of their neighbors.

The jury heard the testimony of experts for both the state and the defense, the argument of the attorneys as well as the court's charge, then retired to deliberate. The jury returned to the courtroom with its verdict of guilty of murder in the first degree, which was accepted and approved by the trial court.

From my review of the record, I find that the evidence, both direct and circumstantial, is overwhelmingly sufficient for any rational trier of fact to find beyond a reasonable doubt that this defendant is guilty of an intentional, deliberately premeditated murder in the first degree for the crime charged. He did not plead insanity, nor did any of the experts find him entitled to such a defense. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Duncan,* 698 S.W.2d 63 (Tenn.1985); Rule 13(e), T.R.A.P.

Having reviewed *State v. Shelton,* 854 S.W.2d at 117, and relative past Tennessee cases, I find that the overwhelming facts of the case and the defendant's "disavowal" of the insanity defense did not require that the trial court have given jury instructions on diminished capacity.

For the reasons heretofore stated, I find no merit in issues one and two.

I am of the opinion that issues three and four, as presented under the facts in this record, are without merit. *See* Rule 36(b) T.R.A.P.

I, therefore, dissent.