IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 5, 2003 Session

**JASON M. WEISKOPF  v.  STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Shelby County
No. P 25719     J. C. McLin, Judge**

---

**No. W2002-01675-CCA-R3-PC  - Filed December 22, 2003**

---

Petitioner, Jason M. Weiskopf, was convicted of first degree premeditated murder and was sentenced to life imprisonment. This Court affirmed Petitioner's conviction. *State v. Jason M. Weiskopf*, No. W2000-02308-CCA-RM-CD, 2000 Tenn. Crim. App. LEXIS 787 (Tenn. Crim. App. at Jackson, October 11, 2000). Petitioner timely filed a petition for post-conviction relief. Following an evidentiary hearing, the trial court denied post-conviction relief. In this appeal, Petitioner raises one issue for our review: whether trial counsel was ineffective for failing to present evidence of Petitioner's diminished capacity. After a careful review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Post-Conviction Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Robert C. Brooks, Memphis, Tennessee, for the appellant, Jason M. Weiskopf.

Paul G. Summers, Attorney General and Reporter; P. Robin Dixon, Jr., Assistant Attorney General; William L. Gibbons, District Attorney General; John Campbell, Assistant District Attorney General; and Raymond Lepone, Assistant District Attorney General,  for the appellant, the State of Tennessee.

**OPINION**

**Proof at Trial**

The proof was summarized by this Court on direct appeal as follows:

The state's proof revealed that the defendant and the victim were both employed at the Ridgeway McDonald's in Memphis. On September 13, 1994, a day prior to the homicide, the defendant and the victim had a verbal altercation in the cooking area. That night the defendant told a fellow employee, Cornelius

Buchanan, that he intended to shoot the victim the next morning since he was tired of being called "bitches and whores" by the victim.

The next morning at approximately 2:50 a.m., Mary Lee, the opening manager for McDonald's, arrived at the Ridgeway location to prepare for the 5:00 a.m. opening. Both the defendant and the victim were scheduled to report at 4:00 a.m.

Shortly before 4:00 a.m., Jafus Miller, another employee, heard three (3) shots while he was sitting in his vehicle. He assumed, however, that they were firecrackers. Lee also heard a noise about that time, yet did not realize it was gunfire.

When the employees did not report to work at 4:00 a.m., Lee tried to reach the defendant by phone and was told he had already left for work. At approximately 4:15 a.m., the defendant called her and actually arrived at work at 4:22 a.m.

Shortly thereafter, Miller discovered the victim's body in the McDonald's parking lot. The victim had been shot once in the back and twice in the face. The autopsy report revealed that the victim died as a result of these gunshot wounds.

On the date of the shooting the defendant told Buchanan, "I told you I was gonna kill Marquese." Buchanan did not believe the defendant. The following day the defendant again told Buchanan that he had shot the victim. He stated that he had walked up to the victim in the parking lot, shook his hand and apologized for the prior altercation. When the victim turned his back, the defendant said, "You mother f_ _ _ _" and shot the victim in the back. Defendant related that the victim pled for his life just prior to defendant's shooting him twice in the face. The defendant stated, "the mother f_ _ _ _ s at work will respect me now." Defendant further stated he felt no guilt as a result of the shooting.

The defendant was interviewed by the homicide division at approximately 1:00 p.m. on the date of the homicide. He denied shooting the victim.

Upon gathering other information, the authorities arrested defendant on September 16, 1994. At the time of his arrest he stated that he knew who "had snitched on him." Upon being interrogated, the defendant stated that he shot the victim because he was "messing with me. He was going to shoot me eventually." He stated that he waited for the victim to arrive at McDonald's prior to the shooting. He further conceded that the victim was not armed with a weapon and made no mention that the victim did anything to him just prior to the shooting. The defendant stated he was simply afraid that the victim would eventually shoot him. Defendant also took the authorities to a dumpster where he had thrown the murder weapon. The weapon was recovered.

The defense proof consisted of another fellow employee, Morris Robinson, who testified that both the defendant and the victim had threatened each other on prior occasions. He further testified that the defendant had told him prior to trial that he thought the victim was going for a gun at the time of the shooting.

The defendant elected not to testify, and there was no further defense proof.

*State v. Jason M. Weiskopf*, No. 02C01-9611-CR-00381, 1998 Tenn. Crim. App. LEXIS 153 (Tenn. Crim. App. at Jackson, February 4, 1998).

**Post-Conviction Hearing**

Dr. Wyatt Nichols, a clinical psychologist, testified at the post-conviction hearing that he first met Petitioner in 1988 after Petitioner's mother sought treatment for Petitioner. Dr. Nichols characterized Petitioner at that time as defiant "to an extreme." In September of 1994, following Petitioner's arrest in this case, Petitioner's trial counsel requested an evaluation of Petitioner from Dr. Nichols. Petitioner was eighteen years old at that time. Dr. Nichols met with Petitioner on six different occasions. Dr. Nichols also spoke to Petitioner's parents and a therapist who had previously treated Petitioner. Dr. Nichols administered a personality test to Petitioner, and the test indicated that Petitioner was "scared," "depressed," and "paranoid," but those conditions were partly attributable to Petitioner having been in jail for one month. Dr. Nichols also interviewed Petitioner regarding the offense. Dr. Nichols diagnosed Petitioner as having "mixed personality disorder with paranoid features, depression, antisocial features, and . . . identity confusion." Petitioner told Dr. Nichols that he began "hearing voices" following an incident in school when "he was beaten up by some guys." Petitioner "heard voices" telling him that the victim in this case was going to hurt him. Dr. Nichols distinguished Petitioner from diagnosed schizophrenics or manic depressive individuals who "truly hear voices." Dr. Nichols speculated that the voices that Petitioner heard were his thoughts for which he denied ownership.

Dr. Nichols testified that Petitioner was not psychotic at the time of this offense, but Dr. Nichols observed that Petitioner "may become psychotic" in the future. Dr. Nichols testified that on the morning of the offense, Petitioner "knew what he was doing, in the sense that his stressors or his psychological condition wasn't such that he was psychotic and out of touch with reality." Dr. Nichols testified, however, that Petitioner's "judgment was impaired compared to somebody else in a similar situation. . .because of his tendency toward paranoia, suspiciousness, [and] strong feelings of inadequacy." Petitioner's psychological condition would cause him to "take a situation and misinterpret it as being more threatening to him than a typical situation," and Petitioner would perceive himself as the victim. Dr. Nichols did not believe, however, that Petitioner was "acting in a state of fear" on the day of the offense. Dr. Nichols testified that Petitioner's judgment was to some degree impaired by his personality disorder.

In a letter written to Petitioner's trial counsel, Dr. Nichols stated,

[Petitioner's] responses to the MMPI-2 suggest that [he] has a chronic history of psychiatric difficulties. He is an immature, self indulgent adolescent who has a very poor self-esteem and who is hypersensitive to the point of being suspicious or paranoid about the actions of others. Due to his present situation, he is obviously depressed and experiencing a high degree of distress. This is in part due to his lack of coping skills. At this point his level of distress is such that he may have difficulty differentiating his thoughts or experiences from reality. His paranoia may make it difficult for [him] to interpret others['] actions and thus, he might overreact out of feelings of fear in a situation when a threat does not actually exist. . . . The degree of his distortions and confused thinking may at times be at the point of being psychotic. . . . I do believe that his emotional condition, including his level of psychological functioning did impair [his] judgment and ability to function at the time of the offense.

Dr. Nichols testified that he met with trial counsel prior to trial, and Dr. Nichols told trial counsel that in the course of his evaluation of Petitioner, he became aware of some facts that might hurt his defense if revealed during cross-examination. Dr. Nichols testified that Petitioner had told a friend on the day before the offense that he planned to shoot the victim. Petitioner also attempted to conceal the weapon after the shooting, and he shot the victim three times as the victim was walking away from him. There were also inconsistencies in Petitioner's statements to the police and what he told Dr. Nichols.

Mr. John Pierotti testified that he was the District Attorney General at the time of Petitioner's trial. He testified that after meeting with Petitioner's trial counsel and reviewing the letter from Dr. Nichols addressing Petitioner's mental condition, he advised Mr. Tom Henderson, the prosecuting attorney, that Petitioner might present a viable claim of diminished capacity and requested that Mr. Henderson inform the victim's family of that possibility. Mr. Pierotti also testified that Petitioner's trial counsel indicated that Petitioner would accept a guilty plea offer of thirty-five years.

Petitioner called Donna Levaugh, a juror at his trial, to testify at the post-conviction hearing. The State immediately objected to her testimony. Petitioner's counsel argued that the purpose of her testimony was not to impeach the jury's verdict, but rather that "[trial counsel's] failure to put on this proof [of diminished capacity] might very well have made a difference in the verdict" of the jury. Counsel argued that Tennessee Rule of Evidence 606(b) was therefore not applicable. The post-conviction court declined to consider the juror's testimony, but allowed Petitioner to make a proffer of proof. Ms. Levaugh testified that she had reviewed Dr. Nichols letter to Petitioner's trial counsel regarding Petitioner's mental condition. Ms. Levaugh testified that had that information been available to her at trial, it would have "swayed" her into considering the possibility that Petitioner's actions might have been caused by his mental condition and the verdict might have been different.

We note that in order to receive relief based on the ineffective assistance of counsel, a defendant must demonstrate that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v.*

-4-

*Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). However, neither the trial courts nor this Court require the testimony of jurors to make that determination. Courts "frequently make such determinations without the benefit of juror testimony in the context of claims of ineffective assistance of counsel." *State v. Grover Donnell Cowart*, No. E2002-02232-CCA-R3-PC, 2003 Tenn. Crim. App. LEXIS 556 (Tenn. Crim. App. at Knoxville, June 27, 2003) *perm. to app. denied* (Tenn. 2003). The post-conviction court properly declined to consider the proffered testimony.

Mr. Leslie Ballin, Petitioner's counsel at trial, testified that he learned of Petitioner's "emotional problems" from Petitioner's family members and subsequently requested a mental evaluation from Dr. Nichols. Mr. Ballin used the information received from Dr. Nichols regarding Petitioner's mental condition in an attempt to negotiate a plea agreement with the State prior to trial. Mr. Ballin believed that a negotiated plea agreement by which Petitioner would be convicted of second degree murder would have benefitted Petitioner because of the damaging evidence revealed in the investigation of the offense, including evidence that Petitioner said that he was going to kill the victim and boasted about the killing afterwards. Other harmful evidence included Petitioner's confession to the police that he waited for the victim to arrive and shot him in the back. Mr. Ballin testified that he met with Petitioner approximately twelve to eighteen times outside of court prior to trial, and Petitioner gave inconsistent versions of the facts. Also, the version of events surrounding the shooting that Petitioner told Dr. Nichols was different from what he told Mr. Ballin. Those inconsistencies concerned Mr. Ballin and affected his decision not to call Dr. Nichols as a witness for the defense. Mr. Ballin also testified that he decided not to call Dr. Nichols as a witness out of concern that facts regarding Petitioner's prior history of gang involvement, anti-social behavior, and prior incidents involving weapons would be revealed during cross-examination. Mr. Ballin believed Dr. Nichols' testimony would be more harmful than helpful to Petitioner's case. Mr. Ballin also advised Petitioner not to testify at trial.

Prior to trial, Mr. Ballin filed a "Notice Pursuant to Rule 12.29 (a) and (b)," which stated, "Defendant in this cause intends to rely upon expert testimony pertaining to his *mens rea* of the offense charged." Tennessee Rule of Criminal Procedure 12.2(b) provides:

> If a defendant intends to introduce expert testimony relating to a mental disease or defect or any other mental condition of the defendant bearing upon the issue of his or her guilt, the defendant shall, within the time provided for the filing of pretrial motions or at such later time as the court may direct, notify the district attorney in writing. . . .

Mr. Ballin testified that he "wanted to keep that option open" of calling Dr. Nichols as a witness.

At trial, Mr. Ballin attempted to lessen the degree of homicide by presenting testimony that the victim had threatened Petitioner and Petitioner feared the victim. Mr. Ballin argued that the

victim's threats on the day before the shooting constituted adequate provocation, supporting a conviction for voluntary manslaughter.

The post-conviction court found that the trial counsel's decision not to offer proof of diminished capacity was a matter of trial strategy. The court accredited the testimony of Mr. Ballin that Dr. Nichols' testimony at trial would have been harmful to Petitioner.

**Ineffective Assistance of Counsel**

For a petitioner to successfully overturn a conviction based on ineffective assistance of counsel, the petitioner must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Second, the petitioner must show that the deficiencies "actually had an adverse effect on the defense." *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Should the petitioner fail to establish either factor, the petitioner is not entitled to relief. Our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

*Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069).

The petitioner is not entitled to the benefit of hindsight; the petitioner may not second-guess a reasonably based trial strategy; and the petitioner may not criticize a sound, but unsuccessful, tactical decision made after adequate preparation for the case. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

The issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). We review the trial court's findings of fact underlying a claim of ineffective assistance of counsel under a *de novo* standard with a presumption that those findings are correct unless the evidence preponderates otherwise. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). The post-conviction court's conclusions of law, however, are reviewed under a *de novo* standard with no presumption of correctness. *Id*. at 457.

**Diminished Capacity**

Petitioner argues that trial counsel was ineffective for failing to present expert testimony of diminished capacity. Diminished capacity "is a rule of evidence which allows the introduction of

evidence to negate the existence of specific intent when a defendant is charged with a specific intent crime." *State v. Phipps*, 883 S.W.2d 138, 143 (Tenn. Crim. App. 1994). While evidence of a defendant's diminished capacity does not constitute a defense capable of excusing or defeating a criminal charge, such evidence is relevant to determining the defendant's *mens rea. State v. Grose*, 982 S.W.2d 349, 353 (Tenn. Crim. App. 1997) (citing *Phipps*, 883 S.W.2d at 148). A defendant must introduce evidence, typically expert testimony, to establish that the defendant at the time of the crime was not capable of forming the requisite intent of the crime charged.

At the time of the offense, the premeditated first degree murder statute required that the State prove that the killing was "intentional, premeditated and deliberate." Tenn. Code Ann. § 39-13-202(a)(1) (1991). A person acts intentionally when "the person's conscious objective or desire [is] to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). A premeditated act is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Premeditation necessitates "a previously formed design or intent to kill," *State v. West*, 844 S.W.2d 144, 147 (Tenn. 1992) (citations omitted), and "an act done after the exercise of reflection and judgment . . . [meaning] that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). It also requires that the accused be "sufficiently free from excitement and passion as to be capable of premeditation." *Id*. Deliberation required a finding that the defendant acted with a "cool purpose" and not from "passion or provocation." Tenn. Code Ann. § 39-13-201(b)(1) (1991).

The elements of premeditation and deliberation are questions of fact to be determined by the jury. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. *Id*. Our supreme court delineated several circumstances that may be indicative of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of the intent to kill the victim by the defendant, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. *See id*.

We conclude that Petitioner has not established that the proof preponderates against the trial court's finding that Petitioner's trial counsel exercised sound and reasonably based trial strategy. The proof supports the conclusion that trial counsel's decision not to call Dr. Nichols to testify was made following adequate preparation. The proof shows that counsel requested a psychological evaluation of Petitioner from Dr. Nichols, trial counsel met with Dr. Nichols prior to trial, and trial counsel carefully weighed the benefits versus the harm of presenting Dr. Nichols' testimony to the jury. Moreover, although Dr. Nichols stated that Defendant's judgment and ability to function was impaired, he did not conclude that Petitioner was incapable of forming the requisite intent.

Furthermore, we conclude that Petitioner has not established that he was prejudiced by the alleged deficiency. There was sufficient proof at trial of premeditation and deliberation. One day prior to the killing, Petitioner told a co-worker that he intended to shoot the victim. There was proof that Petitioner waited for the victim to arrive at work before shooting him. Petitioner used a deadly

weapon against an unarmed victim. Petitioner also boasted about the killing after the shooting. Petitioner is not entitled to relief on this issue.

## CONCLUSION

Petitioner has not established that counsel's performance at trial was deficient or that trial counsel's decision not to present expert testimony of Petitioner's mental state prejudiced Petitioner. The judgment of the post-conviction court is affirmed.

_____
THOMAS T. WOODALL, JUDGE