# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 7, 2014 Session

## STATE OF TENNESSEE v. MARIO JOHNSON

**Appeal from the Criminal Court for Shelby County**
**No. 11-07452    James C. Beasley, Jr., Judge**

---

**No. W2013-01124-CCA-R3-CD  - Filed March 13, 2014**

---

The Defendant, Mario Johnson, was convicted by a jury of two counts of aggravated assault and one count of misdemeanor reckless endangerment.  All verdicts were merged into a single conviction for aggravated assault, and the Defendant was sentenced to fifteen years in the Department of Correction.  In this direct appeal, the Defendant argues that an instruction on self-defense, which he requested, should have been included in the final charge to the jury.  Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Lance R. Chism (on appeal), Memphis, Tennessee; and Handel Durham and Robert Hardy (at trial), Memphis, Tennessee, for the appellant, Mario Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Stacy M. McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

This case arises from an August 7, 2011 physical attack on James Brown, the victim, resulting in multiple stab wounds.  For these acts, a Shelby County grand jury charged the Defendant with attempted second degree murder and alternative counts of aggravated assault by causing serious bodily injury or by using a deadly weapon.  See Tenn. Code Ann. §§ 39-12-101, -13-102, -13-210.  The Defendant proceeded to trial.

At trial, the victim testified that in August 2011, he lived with his aunt at 280 Southview Avenue in Memphis. On the evening of Saturday August 6, 2011, he was drinking beer with friends in the front yard of his home. This group included the Defendant, whom the victim had known as an acquaintance from the neighborhood for about three years. The men where engaging in a conversation about jobs and careers, when the Defendant interrupted the victim. The victim admitted that he did not "want to hear what [the Defendant] had to say" and called the victim something like a "punk a-s n---r." When the Defendant responded, the victim hit the Defendant and wrestled the Defendant to the ground. Neither individual was armed at this point.

After the fight, the Defendant got up off the ground and walked home, threatening that "he would be back." The other men also left the gathering, but the victim remained in the yard outside his home. According to the victim, about five to ten minutes later, he saw the Defendant walking back down the street at a "fast pace" towards him. The victim began cursing at the Defendant, saying that he was not afraid of the Defendant. Although the victim could not remember specifically what he said to the Defendant, he acknowledged that it was "something vulgar," "provocative," and "hateful." However, upon seeing that the Defendant was carrying a butcher knife, the victim ran away.

The victim testified that he "ran about four houses down, jumped a gate, went behind a house and sat down for a minute to get [his] thoughts together[.]" After about five minutes had passed, he came from behind the house and began walking home. The victim believed it was after midnight at this time. As the victim exited from behind the house, he did not see the Defendant but, nonetheless, started yelling loudly with his hands in the air, "Mario, let's squash it. Let's squash it." As the victim neared his aunt's house, the Defendant came out from a "dark bushy area" and stabbed the victim, twice in the chest and then once on the arm and once on the hand. According to the victim, his "blood just started bubbling out[,]" and the victim asked the Defendant if the Defendant was trying to kill him. The victim suffered four stab wounds in all.

The victim kicked the Defendant in the knee and managed to fight off the Defendant. Bleeding severely, the victim made his way to the home of a retired police officer, Leonard Draper. After Mr. Draper opened the door, the victim fell onto his floor and kept kicking at the door, trying to close it in an apparent effort to keep the Defendant from entering. The victim informed Mr. Draper that the Defendant was the person who stabbed him, but Mr. Draper never saw the Defendant that night. After Mr. Draper phoned 911, the victim was taken to the hospital where he stayed for several days.

A wallet and identification belonging to the Defendant were found near a curb next to the victim's front yard. Blood was also found close by the wallet. When the Defendant

was arrested later that morning, he had blood stains on his clothing. His only visible injury was a scratch on the knee, which was covered by a band-aid. The victim identified the Defendant as his attacker upon subsequent questioning at the hospital.

No other witnesses testified about the facts of the offense. The only other State's witnesses to testify were Mr. Draper and several officers who investigated the attack. The Defendant did not present any proof in his defense and made no statements to the officers at the time of his arrest.

Following the conclusion of proof, the jury convicted the Defendant of misdemeanor reckless endangerment, see Tennessee Code Annotated section 39-13-103, as a lesser-included offense of attempted second degree murder and as charged for both counts of aggravated assault. At the sentencing hearing which followed, the trial court merged all of the jury verdicts into one conviction for aggravated assault and sentenced the Defendant as Range III, persistent offender to fifteen years' incarceration. This timely appeal followed.

## ANALYSIS

On appeal, the Defendant challenges the trial court's refusal to issue an instruction on self-defense in its charge to the jury. Specifically, he submits that the proof supported such an instruction. The State responds that the trial court properly determined that such a charge was not raised by the evidence.

A trial court has the duty to "give a complete charge of the law applicable to the facts of the case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). This duty includes "giving jury instructions concerning fundamental issues to the defense and essential to a fair trial . . . . " State v. Anderson, 958 S.W.2d 9, 17 (Tenn. Crim. App. 1998). The defendant has the burden of introducing admissible evidence that a defense is applicable. Tenn. Code Ann. § 39-11-203(c), Sentencing Comm'n Cmts. Thus, this court may find error only if a jury charge "fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

In deciding whether a defense instruction is warranted, the trial court "must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001). Tennessee defines self-defense as follows:

> (1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when

and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

      (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

      (A) The person has a <u>reasonable belief</u> that there is an <u>imminent danger of death or serious bodily injury</u>;

      (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

      (C) The belief of danger is founded upon reasonable grounds.

<u>See</u> Tenn. Code Ann. 39-11-611(b) (emphasis added); <u>see also</u> T.P.I. Crim—40.06(b). In Tennessee, the law of self-defense is fundamental to a case when the evidence fairly raises it as an issue. <u>See</u> Tenn. Code Ann. § 39-11-203(c); <u>see also</u> <u>Myers v. State</u>, 206 S.W.2d 30, 32 (Tenn. 1947) (holding that a defendant is entitled to an affirmative instruction on self-defense if raised by the evidence).

The Defendant requested an instruction on self-defense, but the trial court denied his request finding that such an instruction was not supported by the proof. In ruling on the issue, the following exchange took place:

      [DEFENSE COUNSEL]: If I can say now in the victim's statement he said he was hollering let's squash it and he started and he was mentioning that -- he alluded to he started all of this. I think he was saying let's squash it and he made certain statements.

      THE COURT: Yes, sir. I'm not -- I don't think -- I mean, I think that's the issue obviously is there was Incident Number 1 and there's Incident Number 2. I call Incident Number 1 the fight and the slap and the throw down or whatever. I call Incident Number 2 the stabbing. And at that point the proof that I have before me is that, yes, there was some prior altercation, but at the time of the stabbing the victim has run, had separated himself, has hidden, and is walking out saying let's end this. Let's end this. And then he's attacked and stabbed by the [D]efendant. That's the proof that's been presented.

Defense counsel reminded the trial court of the racial slur used by the victim and the alcohol consumed that night. The trial court responded,

Well, but there's -- those are statements and those statements were made prior to the victim running and hiding and then coming out yelling let's end this. Let's end this. Or let's squash this or whatever his words were. And so I have, to me, two separate incidents. I don't have -- at the time of the stabbing, I don't -- the only proof I've got is the victim has run, has separated himself from the incident, has hidden, has walked out, according to the testimony, got his hands in the air yelling hey, let's squash this. And I just don't see even in the light most favorable to the [D]efendant at that point that self-defense has been raised.

The trial court further explained its ruling at the motion for new trial hearing:

[T]he facts as I recall them was that there was an altercation between the [D]efendant and the victim.

And I don't think there was any question but that the victim struck the [D]efendant. I can't remember whether he knocked him down, but I know he hit him or pushed him or there was some type of altercation.

And I actually think maybe he knocked him down.

But be that as it may, I know there was an altercation, there were words, and there was some physical contact.

And if all of this had flowed as a result of that incident, I would have very probably charged self-defense.

But the facts evolved from that incident where the victim struck the [D]efendant and knocked him down is that the [D]efendant left the scene.

I don't know whether he went home or wherever he went, but he left the scene, he left the action, he left the incident, he left the confrontation, he went away.

And when he returned, he came back armed with a knife.

And my recollection is that the victim saw that he was armed with a knife, and ran, and fled, and hid, and tried to get away from, and hid in somebody's backyard and stayed there until he thought it was all safe to come out again.

And then, he testified as he's walking down the street, because I -- this is the part that sticks in my mind -- he's walking down the street and he's yelling out, hey, Mario or whatever he was yelling, let's just squash this, let's squash this, you know, let's end it, you know, hey, hey, let's call all this off. And the [D]efendant appeared out of the darkness and stabbed him several times.

And so, I think you can't take the incident without breaking them into separate parts.

-5-

And I think like I said, if the stabbing had occurred at the very first incident where the victim hit the [D]efendant, I would have probably been more -- much more inclined to charge[] self-defense or I would have at least thought more seriously.

But as the facts developed, it's totally separate. There's a break. There's an indication that the victim is saying, you know, no more, I don't want to fight, call it all off, and the [D]efendant then reacts with the stabbing.

I don't think that's self-defense. I don't think that it's a proper charge for self-defense. . . .

I do recognize that I should charge it, again, in the light most favorable to the defense, if it's even raised in the slightest.

I personally don't feel based on these facts that it was raised.

. . . .

But that's my analysis is that -- it was a total separate break there. And once the victim separates himself from the [D]efendant and the cause of action and the problem and then obviously indicates that he's willing to not fight any more, doesn't want to fight any more, there's no more threat to the [D]efendant, and I think at that point, I don't think self-defense rises, should be charged.

The Defendant first notes on appeal that the victim was the "initial aggressor." He then submits that it was reasonable for him to conclude that, when the victim ran away from him, the victim was obtaining a weapon; that, when the victim exited from behind the house, it was reasonable for him to conclude that "the victim was challenging him to fight to the death"; and that it was reasonable for him to conclude that he "needed to immediately stab the victim before the victim killed him or inflicted serious bodily injury upon him." Thus, he contends the proof warranted an instruction on self-defense. However, we disagree. The Defendant left the altercation, armed himself, and returned to find the victim. Although the victim used foul language at first, the victim then ran away from the Defendant when he saw the visible butcher knife. Approximately five minutes had passed when the victim exited from his hiding place. The victim was unarmed. The Defendant remained in the area and stabbed the victim immediately upon encountering him. We agree with the trial court that there was simply no objective basis to conclude that the Defendant reasonably believed he was in imminent danger of death or seriously bodily injury based upon the facts of this case. Accordingly, the refusal to issue an instruction on self-defense was not error. See, e.g., State v. Billy Gene DeBow, Sr., No. M1999-02678-CCA-R3-CD, 2000 WL 1137465, at *7 (Tenn. Crim. App. Aug. 2, 2000) (holding no error for declining to issue self-defense instruction when, following possible assault by the victim on the Defendant, the Defendant left and then returned; the next encounter involved only an exchange of words until the Defendant shot the unarmed victim from fifteen to twenty feet away.)

-6-

## CONCLUSION

In sum, we conclude that the trial court did not err by declining to give the requested instruction on self-defense. The judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE