IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 6, 2018

**STATE OF TENNESSEE v. RODNEY ALAN KIEFNER**

**Appeal from the Circuit Court for Madison County**
**No. 16-474    Kyle Atkins, Judge**

_____

**No. W2017-02096-CCA-R3-CD**
_____

The Defendant, Rodney Alan Kiefner, appeals from the Madison County Circuit Court's denial of his Tennessee Rule of Criminal Procedure 32(f) motion to withdraw his 2017 guilty pleas to attempted first degree murder and two counts of aggravated assault, for which he is serving an effective fifteen-year sentence. The Petitioner contends that the trial court erred by denying his motion because his guilty pleas were involuntary and because he received the ineffective assistance of counsel. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Robert Golder, Memphis, Tennessee, for the appellant, Rodney Alan Kiefner.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Nina Seiler, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the Petitioner's June 28, 2017 negotiated guilty pleas to attempted first degree murder and two counts of aggravated assault, one count of which merged into the attempted first degree murder conviction, in exchange for an effective fifteen-year sentence at 85% service.

**Guilty Plea Proceeding**

At the June 27, 2017 guilty plea hearing, the State and the Defendant stipulated to the facts alleged in the indictment as supporting the guilty pleas. The indictment alleged relative to attempted first degree murder that on May 19, 2016, the Defendant "unlawfully, knowingly, intentionally," and with premeditation attempted to kill Jonathan Tyler Rutan by stabbing Mr. Rutan, causing serious bodily injury. The indictment alleged relative to aggravated assault that the Defendant "intentionally and/or knowingly" caused Jonathan Tyler Rutan to suffer serious bodily injury by the use of a knife, which was a deadly weapon. The last indictment count alleged that the Defendant caused Scott Cox to fear reasonably imminent bodily injury by "intentionally and/or knowingly" "displaying and/or using" a knife, which was a deadly weapon.

The trial court instructed the Defendant to ask questions if he did not understand the proceedings, and the Defendant agreed. The Defendant told the court that he was not under the influence of drugs or alcohol. Relative to his mental capability, the Defendant stated that he had "some mental problems" but that he thought he was "okay." Counsel informed the court that the Defendant had been diagnosed with multiple mental health disorders since childhood, that the Defendant had not received his needed medication in confinement, and that the Defendant reported to counsel that he understood the proceedings. Counsel said that the Defendant had been evaluated at Western Mental Health Institute (Western), that the physicians concluded the Defendant "was fine," that the Defendant was also evaluated at Pathways Behavior Health Services (Pathways), and that the physicians at Pathways also concluded the Defendant "was fine." Counsel said that the jail physicians "indicate[d] he needs . . . antipsychotic medication."

The Defendant told the trial court that he had obtained his GED and that he had never been in legal trouble before this incident. The Defendant said that he and counsel had reviewed his case, discussed the facts of the case, reviewed the indictment, discussed the strengths and the weaknesses of the case, discussed the possible defenses, and discussed the benefits and pitfalls of proceeding to a trial and accepting a plea offer. The Defendant said he did not have questions for counsel. The trial court reviewed the petition to accept guilty pleas, and the Defendant said that the document reflected his signature, that he and counsel discussed the rights he waived by pleading guilty, and that counsel "did her job" in explaining the terms and ramifications of the plea agreement.

At the trial court's request, the prosecutor stated the terms of the plea agreement and the sentencing range for each offense, and the Defendant stated that he had no questions about the plea agreement. The Defendant said he understood that by pleading guilty he was waiving his rights to plead not guilty and proceed to a trial by jury. He said he understood that he had the rights to the assistance of appointed counsel, to compel witnesses to testify on his behalf, to confront and cross-examine all the State's witnesses, to remain silent, and to appeal any conviction and sentence. The Defendant stated that he

understood he was admitting his guilt to the offenses to which he was pleading guilty and that the present convictions would serve as a basis to increase the punishment for any future convictions. The Defendant stated that he was entering his guilty pleas freely and voluntarily. He denied anyone had forced or pressured him to plead guilty. He denied anyone had threatened him or promised him anything to induce him to plead guilty. He said he was pleading guilty because it was "the best course of action." The Defendant said that he had no questions for counsel and that he understood everything the court had reviewed. The Defendant said that he was satisfied with counsel's representation.

The Defendant agreed that the facts contained in the indictment were "substantially correct." The Defendant stated he understood that he was pleading guilty to attempted first degree murder and would receive fifteen years' confinement at 85% service, that one count of aggravated assault would merge with the attempted first degree murder conviction, and that he would receive a concurrent six-year sentence at 30% service for the second aggravated assault conviction. The Defendant stated that he wanted the court to accept the plea agreement, and the court found that the Defendant was pleading guilty freely, voluntarily, and intelligently.

### Motion to Withdraw Guilty Pleas

On July 27, 2017, the Defendant filed a motion to withdraw his guilty pleas, arguing that manifest injustice required vacating the convictions because he had not been provided medication necessary for his entry of knowing and voluntary guilty pleas. The Defendant's counsel at the guilty plea hearing was served with a State subpoena, which she attempted to quash. In its response to the motion to quash, the State argued that the Defendant's motion to withdraw guilty pleas involved an ineffective assistance of counsel allegation and that counsel's testimony was necessary. The trial court denied counsel's motion to quash the subpoena after determining that the Defendant had raised an ineffective assistance of counsel allegation in his motion to withdraw guilty pleas. We note that the record does not reflect that the Defendant raised a stand-alone claim of ineffective assistance of counsel. His claim, rather, was that manifest injustice required the court to grant his motion to withdraw his guilty pleas because, in part, counsel provided the ineffective assistance of counsel.

At the motion hearing, the Defendant testified that he grew up in Alabama and Connecticut and that he was diagnosed as a teenager with bipolar disorder with schizophrenic tendencies. He recalled receiving in-patient mental health treatment at "East Alabama Mental Health" and at "Bridges" in Connecticut. He said that he was also evaluated at Columbia University in connection with a mental health study. He said that when he was age eighteen or nineteen, he was involved in a serious car accident and that his symptoms became worse afterward. He said that by age twenty-three, he began receiving "signs from God," which he described as receiving messages, answers to questions, and "directions on things." He said that at this time, he believed the

-3-

communications were from God. He identified medications he had previously been prescribed and his current medications but said he was not taking medication at the time of the incident in this case. He said that at the time of the incident, he had been prescribed Seroquel twice daily, that the medication tranquilized him, that he had been working on roofs, and that he stopped taking his medication in order to work. He said that although he had been prescribed Seroquel, it was almost impossible to work while taking it.

The Defendant testified that he thought his mental illness could have been relevant to his defense because he was not himself at the time of the incident. He said that his coworkers noticed "things that [were] going on that [were not] normal." He thought the incident would not have occurred if he had taken his medication. He said that he had never been violent toward others but that he had "fear[ed] for his life . . . stuff like that" because people had attempted to assassinate him three or four years before his incarceration. The Defendant believed that the government had tried to assassinate him and that he probably should not discuss it publicly. When counsel advised the Defendant that he was safe in the courtroom, the Defendant stated that the government was trying to kill him because he began speaking out against human trafficking and child sexual abuse. He said that because he was "out of the way" in confinement, it did not seem as though the government was "actively trying to get" him.

The Defendant testified that at the guilty plea hearing, he and counsel discussed his mental health and the government's attempts on his life before he entered his guilty pleas. He said that he told counsel, "I was tired, I just give up, or rather they just give me a lethal injection. I'm just . . . tired of the torture that I've been through by the . . . government." He said that he was not supposed to talk about "this stuff" because "things [got] worse" if he talked about it. The Defendant knew he pleaded guilty and said that he pleaded guilty because he told counsel that he had no defense. The Defendant said, though, that although counsel told him he had a choice whether to plead guilty, he had no defense. He said that after his pretrial mental health evaluations, counsel never discussed whether his mental illness was relevant to a defense.

The Defendant testified that he understood he could have received ten additional years if he were convicted at a trial, which would have increased his sentence to twenty-five years. He said that on the day he entered his guilty pleas, he had taken Lithium and Celexa and that those were the only medications "they" would give him. He said that he would have been taking Seroquel at this time and that he was unsure whether he should have been taking Lithium and Celexa or Depakote and Celexa, in addition to Seroquel. He said that he was not taking Seroquel at the time of the motion hearing but that he was taking Lithium and Celexa. He said that he felt similar to the way he felt on the day of the guilty plea hearing. When asked if he would have testified at the guilty plea hearing about the government's attempts on his life, he stated that he was afraid to talk about it "over a microphone and in front of other people." He said it was dangerous to discuss.

-4-

He said that he knew it was true at the time of his testimony and at the time he pleaded guilty. The Defendant said that although it had been a long time since he had taken Seroquel, it made him calm and level-headed, caused him to sleep more, and decreased his anxiety.

On cross-examination, the Defendant testified that he spoke to multiple physicians at Western and that he "felt uncomfortable . . . speak[ing] to a roomful of . . . people and stuff like that." He said that his request to speak to the physicians individually was denied because he was at the facility only for a thirty-day evaluation. He said that he met with nine or ten people simultaneously and that he did not know how many were physicians. He said he told them that he heard voices from God and that he had a previous mental health diagnosis. He said that he did not mention Seroquel or his concern that the government had attempted to kill him.

The Defendant testified that counsel told him the results of the mental health evaluation at a court appearance. He said that during his pretrial confinement and before he entered his guilty pleas, he was prescribed Celexa and Lithium but was not prescribed Seroquel. He said that before his arrest, he "could not" take Seroquel because the medication hindered his ability to work. He recalled that the trial judge asked him and counsel questions during the guilty plea hearing, but he could not recall the questions or his responses with specificity. However, he did not dispute the accuracy of the guilty plea hearing transcript. He recalled reviewing the guilty plea documents with counsel before the hearing.

On redirect examination, the Defendant testified that he could function with only Lithium and Celexa. He said that he and a physician at Western discussed whether he understood the world correctly without taking Seroquel and that "What I say -- what I think I -- or what I see or what I understand is -- well, it's -- it's real. I -- What I'm talking about is real. It's not -- it's not it's not pretend to me." He said that attempted first degree murder involved premeditation and that he understood the definition of premeditation "a little bit" but was not an attorney. He said that attempted second degree murder did not involve premeditation and that the distinction between the offenses related to the possible sentences. He denied that trial counsel discussed the definitions of and the distinctions between attempted first degree murder and attempted second degree murder. The Defendant said that he and counsel did not discuss attempted second degree murder. He said that he asked questions about lesser included offenses and that counsel said, "There was no possible way."

Counsel at the guilty plea hearing testified that she and the Defendant discussed the purpose of the mental health evaluation at Western, that she discussed the Defendant's previous diagnoses with the evaluating physician, and that she provided the limited medical records she had in her possession to the evaluating physician. Counsel said that the Defendant's mother was supposed to obtain the remainder of the records,

that the Defendant's mother reported sending the records to counsel by mail, and that counsel never received them. Counsel said that she received the evaluating physicians' report, stating that the Defendant was "competent and sane" at the time of the offenses, and that she discussed the report with the Defendant.

Counsel testified that the Defendant "[e]ssentially . . . had really no defense because of everything that was stacked against him." She told the Defendant that she would fight to obtain the best possible outcome if he wanted a trial but that the steps he took leading up to the offenses would have made it difficult to establish he acted without premeditation. Counsel recalled the evidence showed that the Defendant purchased bleach and sheets and that he sharpened the knife before the assault. Counsel said the State had video recordings and receipts relative to the Defendant's purchases and a witness who saw the Defendant sharpening the knife.

Counsel testified that the Defendant expressed concern about his medication, that she talked to the jail staff, and that the staff told her jail policy only permitted certain medications be provided to inmates. She said that she and the Defendant discussed the medications the jail staff provided, that she ensured he took the medications, and that he communicated coherently, although he periodically became sidetracked with "the government." She said that the State's initial plea offer was twenty years but that the offer was reduced to fifteen years. She said that on the day she explained the fifteen-year offer and the mental health evaluation reports, the Defendant was coherent and "totally understood." She said that after their discussion, the Defendant began pacing and "kind of ranting" in front of a guard. She said that she remained close to ensure nothing happened. She said the guard told her that the Defendant's behavior was normal and that he would not "do anything." She said that once the two mental health evaluation reports showed the Defendant was competent, her "hands were tied." She said that she negotiated the plea offer to fifteen years because she knew the Defendant would have been convicted at a trial.

Counsel testified that on the day of the guilty plea hearing, the Defendant understood what he was doing and that she asked the Defendant multiple times if he wanted to plead guilty. She said she told the Defendant that she could ask for additional time to consider the plea offer and could schedule a trial date. She said the Defendant told her that he was sure he wanted to plead guilty.

On cross-examination, counsel testified that she did not seek a court-appointed mental health expert for the defense because the Defendant had been evaluated twice at different institutions, that she thought the outcome of a third evaluation would have been identical, and that it would have been the "battle of the experts" had a third evaluation resulted in a different outcome than the previous evaluations. She noted that Western had all of the Defendant's previous records, except for the records from New York, which she

thought had been destroyed. Counsel said that the Defendant's mother provided the New York records to Western but did not provide them to counsel.

Counsel testified that premeditation was the primary distinction between attempted first degree murder and attempted second degree murder. She said that the Defendant was not taking his prescribed medications at the time of the offenses and that his voluntary failure to take the medications was not a defense. She said that she discussed an insanity defense with the Defendant and attempted to use his mental health as a defense but that the Defendant "had other drugs in system" that would have "killed any type" of reliance on his mental health. She said that she did not tell the Defendant that "he had absolutely no defense" but rather that this was "a very difficult case because of all the steps he took" before the offenses. She said that if the Defendant had not pleaded guilty, "it would have been a Hail Mary" at a trial and that she would have relied on the Defendant's mental health diagnoses, although he was not mentally incompetent, and would have attempted to "poke holes" in the State's evidence during cross-examination. Counsel stated that she knew she could have sought an independent mental health expert but that she determined an independent expert would not have been beneficial to the defense because the expert, in her opinion, would have made the same conclusions as the previous experts. She was not a psychiatrist but said that she had been a criminal defense attorney for a while and that based upon the Defendant's ability to explain with specificity how the offenses occurred, he understood what was happening and what he was doing at the time of the offenses. She had not read *State v. Phipps*, 883 S.W.2d 138 (Tenn. Crim. App. 1994).

The trial court made oral findings and determinations at the motion hearing and subsequently entered a written order denying the motion to withdraw the guilty pleas. The court reviewed the guilty plea hearing transcript and determined that the court questioned the Defendant at length about whether his pleas were voluntary, whether he understood the rights he waived by pleading guilty, whether he was satisfied with counsel's performance, and whether he had questions for the court. The court determined that the Defendant answered the court's questions affirmatively and did not ask the court and counsel any questions.

The trial court determined that the Defendant underwent mental health evaluations before the guilty plea hearing and was found competent and sane. The court found, based upon the Defendant's testimony, that when the Defendant returned to jail after the evaluation at Western, he received Lithium and Celexa and that the Defendant was provided the same medications at the time of the guilty plea and the motion to withdraw guilty plea hearings. The court questioned whether the Defendant could be incompetent to answer questions at the guilty plea hearing but competent to testify at the motion hearing while taking the same medications. The court found that the Defendant admitted his guilt at the guilty plea hearing and that the Defendant had not asserted his innocence of the conviction offenses. The court found that the Defendant understood what occurred

-7-

during the motion hearing and understood the difference between the fifteen-year sentence he received and the additional ten years he faced if convicted at a trial. The court found that the Defendant also understood the difference between first degree premediated murder and second degree murder. The court noted that no mental health evidence to establish manifest injustice was presented at the motion hearing.

The trial court credited counsel's testimony and found that counsel believed the Defendant understood "his guilty plea[s]," based upon their previous discussions. The court discredited the Defendant's testimony and found that at the guilty plea and motion hearings, the Defendant showed an understanding of his guilty pleas and sentences. The trial court found that medical records were not presented at the motion hearing and that the Defendant's testimony was the only evidence related to the Defendant's mental health.

The trial court determined that the Defendant failed to show manifest injustice existed as a basis for withdrawing his guilty pleas. The court found that the motion to withdraw was filed quickly after the Defendant entered his guilty pleas, which weighed in favor of granting the motion. The court found that relative to why the motion to withdraw was not filed earlier, "those issues" were examined in that the Defendant was referred for mental health evaluations, that he was deemed competent at the time of the offenses, that he could communicate effectively with counsel, and that he understood the issues in his case, all of which weighed against granting the motion. The court found that the Defendant had not maintained or asserted his innocence, weighing against granting the motion. The court found relative to the circumstances underlying the entry of the guilty pleas that the Defendant admitted his guilt at the hearing. The court found that the Defendant understood what occurred at the guilty plea hearing and that the Defendant had "every opportunity" to ask questions.

Relative to the claim that ineffective assistance of counsel resulted in manifest injustice, the trial court found that counsel did not tell the Defendant that he had "no defense" but that counsel told the Defendant it would be a "tough row to hoe." The court found that it would have instructed a jury on all lesser included offenses as required by law and that counsel knew this based upon her previous cases before the court. The court found that the Defendant failed to show that counsel provided deficient performance and that he was prejudiced by counsel's performance. This appeal followed.

The Defendant contends that the trial court erred by denying his motion to withdraw his guilty pleas because his guilty pleas were involuntarily entered and because he received the ineffective assistance of counsel. The State responds that the court did not err by denying the motion.

Tennessee Criminal Procedure Rule 32(f) states that after a trial court has imposed sentence but before a judgment becomes final, "the court may set aside the judgment of conviction and permit the defendant to withdraw the guilty plea to correct manifest injustice." Once a defendant enters a guilty plea, the judgment of conviction "becomes final thirty days after acceptance of the plea agreement and imposition of [the] sentence," meaning a defendant "has thirty days within which to . . . [file] a motion to withdraw the previously entered plea pursuant to Rule 32(f)." *State v. Green*, 106 S.W.3d 646, 650 (Tenn. 2003). A trial court's determination regarding a motion to withdraw guilty plea is reviewed for an abuse of discretion. *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010). An abuse of discretion occurs when a trial court "applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, . . . applies reasoning that causes an injustice to the complaining party . . . [and] fail[s] to consider the relevant factors provided by higher courts as guidance for determining an issue." *Id*.

Rule 32(f) does not provide "a criminal defendant who has [pleaded] guilty . . . a unilateral right to later withdraw his plea either before or after sentencing." *Id.* at 444; *see State v. Crowe*, 168 S.W.3d 731, 740 (Tenn. 2005); *State v. Mellon*, 118 S.W.3d 340, 345 (Tenn. 2003). "The defendant bears the burden of establishing sufficient grounds for withdrawing [a] plea." *Phelps*, 329 S.W.3d at 444; *see State v. Turner*, 919 S.W.2d 346, 355 (Tenn. Crim. App. 1995). In determining whether to grant a motion to withdraw a guilty plea, trial courts "should always exercise . . . discretion with caution in refusing to set aside a plea of guilty, to the end that one accused of crime may have a fair and impartial trial." *Phelps*, 329 S.W.3d at 444 (internal quotation and citation omitted). Trial courts should consider

> (1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted.

*Id*. at 446; *see U.S. v. Haywood*, 549 F.3d 1049, 1052 (6th Circ. 2008); *U.S. v. Spencer*, 836 F.2d 236, 239-40 (6th Cir. 1987). However, these factors are "not exclusive," and "no single factor is dispositive." *Phelps*, 329 S.W.3d at 446. A trial court should permit a defendant to withdraw a guilty plea if, after weighing these factors, the court determines that "the balance of factors weighs in the defendant's favor, . . . even if the defendant's reasons could be characterized as a change of heart." *Id.* at 448.

As a preliminary matter, we note that the trial court made findings relative to the majority of the *Phelps* factors in determining whether the Defendant's motion pursuant to Rule 32(f) should be granted based upon allegations of involuntary guilty pleas and ineffective assistance of counsel. However, the Defendant has not referenced the *Phelps* factors in his appellate brief. Rather, he argues that to prevent a manifest injustice, he should be permitted to withdraw his guilty pleas because they were involuntary and the result of ineffective assistance of counsel. Although the State references *Phelps* in its brief, its analysis of whether the trial court erred by denying the motion considers simply whether the Defendant's guilty pleas were involuntary and the product of ineffective assistance without reference to the *Phelps* factors.

The record reflects that the Defendant entered his guilty pleas on June 27, 2017, and that on July 27, 2017, the Defendant filed the motion to withdraw his guilty pleas. The trial court found that the motion to withdraw was filed quickly after the entry of the Defendant's guilty pleas, which weighed in the Defendant's favor. However, this court has previously determined that a one-month lapse between the entry of a guilty plea and the filing of a motion to withdraw a guilty plea is inconclusive, neutral, and of no consequence. *Compare State v. David Jerome Powell*, No. W2015-00366-CCA-R3-CD, 2015 WL 7282747, at *7 (Tenn. Crim. App. Nov. 18, 2015) (determining that a five-week lapse between the entry of the guilty plea and the motion to withdraw guilty pleas was "at best . . . neutral"), *State v. Mitchell Nathaniel Scott*, No. M2013-01169-CCA-R3-CD, 2014 WL 1669964, at *5 (Tenn. Crim. App. Apr. 25, 2014) (concluding that a one-month lapse was "inconclusive"), *and State v. Marcus E. Robinson*, No. M2005-00670-CCA-R3-CD, 2006 WL 1097456, at *5 n.5 (Tenn. Crim. App. Apr. 5, 2006) (determining that a one-month lapse was "of no consequence . . . as it was neither a particularly long nor short time"), *with Phelps*, 329 S.W.3d at 449 (determining that a nearly seven-week lapse was "a significant length of time" and weighed "somewhat against" granting the motion to withdraw guilty pleas), *and State v. Kevin Glenn Tipton*, No. E2012-00038-CCA-R3-CD, 2013 WL 1619430, at *12 (Tenn. Crim. App. Apr. 13, 2013) (determining that filing the motion to withdraw more than six weeks after pleading guilty was "a substantial amount of time"). We conclude that this factor neither weighs in favor of nor against granting the Defendant's motion.

Relative to whether a valid reason exists for why the motion was not filed earlier, the record reflects that the trial court found that "those issues" were examined in that the Defendant was referred for mental health evaluations, was deemed competent, could communicate with counsel, and understood all the issues in this case. However, the record reflects that the mental health evaluations concluded before the Defendant entered his guilty pleas and that the reports had been submitted to counsel before the guilty plea hearing. In any event, the record does not reflect that at the motion hearing, the defense provided a particularized reason for why the motion was not filed earlier. Present counsel filed his notice of appearance and the motion to withdraw the Defendant's guilty pleas on the same day, and neither document provides information relative to the

circumstances leading to the Defendant's desire to withdraw his guilty pleas, the Defendant's retaining present counsel, and when present counsel was instructed to file the motion. A defendant's failure to provide an explanation for the failure to file the motion sooner has been considered a neutral and inconclusive factor in determining whether to grant a defendant's motion to withdraw guilty pleas. *See Phelps*, 329 S.W.3d at 449; *State v. Timothy Lamar Baker*, No. E2016-01332-CCA-R3-CD, 2017 WL 1493491, at *3 (Tenn. Crim. App. Apr. 26, 2017); *David Jerome Powell*, 2015 WL 7282747, at *7; *State v. Timothy Damon Carter*, No. M2010-02248-CCA-R3-CD, 2012 WL 2308293, at *7-9 (Tenn. Crim. App. June 18, 2012). *But c.f. State v. Ronald McMillan*, No. M2012-02491-CCA-R3-CD, 2013 WL 4082628, at *4 (Tenn. Crim. App. Aug. 14, 2013) (concluding that "[t]he lack of an explanation for the lapse of time between the plea and the motion to withdraw weighs against permitting withdrawal of the plea"). We conclude that this factor neither weighs in favor of nor against granting the Defendant's motion.

Likewise, the record does not reflect that the Defendant has asserted or maintained his innocence, which the trial court determined at the motion hearing. At the guilty plea hearing, the Defendant stipulated to the facts contained in the indictment, alleging two counts of aggravated assault and one count of attempted first degree murder, told the trial court that the facts contained in the indictment were "substantially correct," and admitted his guilt to the conviction offenses. At the motion hearing, the testimony related to the impact of the Defendant's mental health in his decision to plead guilty and to whether the Defendant could have been convicted at a trial of a lesser included offense of attempted first degree murder. This factor weighs against granting the motion to withdraw.

Relative to the circumstances underlying the entry of his guilty pleas, the trial court determined that the Defendant entered knowing guilty pleas and received the effective assistance of counsel. The Supreme Court has concluded that a guilty plea must represent a "voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). A trial court must examine in detail "the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin v. Alabama*, 395 U.S. 238, 243-44 (1969); *see Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). Appellate courts examine the totality of circumstances when determining whether a guilty plea was voluntarily and knowingly entered. *Turner*, 919 S.W.2d at 353. A guilty plea is not voluntary if it is the result of "[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats." *Boykin*, 395 U.S. at 242-43; *see Blankenship*, 858 S.W.2d at 904. A petitioner's representations and statements under oath that his guilty plea is knowing and voluntary create "a formidable barrier in any subsequent collateral proceedings [because] [s]olemn declarations . . . carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

The record reflects that the Defendant entered knowing, voluntary, and intelligent guilty pleas. The Defendant's testimony at the motion hearing is the primary evidence related to his mental health. Although the guilty plea hearing transcript mentions the two mental health evaluations performed to determine the Defendant's mental state at the time of the offenses and whether he was competent to stand trial, the reports are not included in the appellate record. Counsel told the trial court at the guilty plea hearing that the evaluating physicians concluded that the Defendant "was fine." The Defendant did not present evidence at the motion hearing refuting the competency determination, did not question counsel about the contents of the reports, and did not present any additional mental health information regarding the Defendant's prescription medications. Likewise, the Defendant's testimony at the motion hearing reflects that although the Defendant had been prescribed Seroquel at the time of the offenses and voluntarily stopped taking the medication in order to work, he took Lithium and Celexa at the time he entered his guilty pleas and at the motion hearing.

At the guilty plea hearing, the trial court told the Defendant to ask questions if he did not understand the proceedings, and although he agreed to ask questions, he asked the court no questions. The Defendant was not under the influence of alcohol or drugs, and he said that although he had "mental problems," he was "okay." Counsel told the court that the Defendant understood the proceedings and that the mental evaluations determined that the Defendant "was fine." The Defendant told the court that he had obtained his GED, that he had never been in legal trouble before this case, and that he and counsel had discussed the strengths and weaknesses of the case, the possible defenses, the benefits and pitfalls of proceeding to a trial and accepting a plea offer, and the facts underlying the offenses. The court reviewed the contents of the plea agreement with the Defendant, and the Defendant acknowledged it reflected his signature. The Defendant said that he and counsel discussed the rights he waived by pleading guilty and that counsel "did her job" in explaining the terms and ramifications of his guilty pleas. The court reviewed the rights the Defendant waived by pleading guilty, and he stated that he understood. The Defendant stated that he was pleading guilty freely and voluntarily and denied that anyone had forced, pressured, and threatened him to plead guilty. The Defendant said that pleading guilty was "the best course of action" and that he understood the terms of the plea agreement. The record does not reflect that the Defendant's behavior was erratic or disruptive.

The Defendant's motion hearing testimony reflects that he understood the terms of the plea agreement because he discussed the difference between attempted first degree murder and attempted second degree murder, understood the possible sentencing outcomes for each offense, and understood he faced a longer sentence if convicted after a trial. The Defendant testified that he "could function" with only Lithium and Celexa, the two medications prescribed at the time of the guilty plea and motion hearings. Although the Defendant stated that counsel reported having "no defense," counsel's credited testimony reflects that she told him the evidence was "stacked against him." Counsel

said she told the Defendant that she would take the case to trial but that the steps he took before the offenses made it difficult to establish he acted without premeditation. Counsel stated that receipt and video-recording evidence showed the Defendant's purchasing bleach and sheets before the offenses and that a witness saw him sharpening the knife before the offenses. Counsel testified that although the Defendant periodically became sidetracked during their discussions, the Defendant communicated coherently, understood their discussions, and described how the offenses occurred with specificity. Counsel said that on the day the Defendant pleaded guilty, she asked him multiple times if he wanted to plead guilty and told him she could request a continuance or a trial date. Counsel said the Defendant was sure he wanted to plead guilty. The record supports the trial court's determination that the Defendant understood the guilty plea proceedings, understood the terms of the plea agreement, and entered knowing and voluntary guilty pleas.

Relative to whether counsel provided ineffective assistance by failing to consider diminished capacity as a defense and convictions for lesser included offenses, the Defendant was required to establish that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a defendant must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. To establish the prejudice prong, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The Defendant argues that counsel provided ineffective assistance because she did not know what medications treat schizophrenia, as evidenced by her testimony that she thought Seroquel treated bipolar disorder, and had never read *State v. Phipps*. He argues that had counsel read *Phipps*, she would have been familiar with diminished capacity and understood that the Defendant could have been convicted of a lesser included offense of attempted first degree murder based upon an inability to act with premeditation. Although the Defendant disputes counsel's knowledge of anti-psychotic medication, no medical evidence was presented at the hearing. The record reflects that counsel investigated the Defendant's mental health. Counsel requested a mental health evaluation, discussed the Defendant's conditions with his mother, and discussed the Defendant's previous diagnoses with the evaluating physicians. Counsel said that the

-13-

competency determinations coupled with the State's evidence would have made it difficult to show the Defendant acted without premeditation and determined that the Defendant would have been convicted at a trial. Although the State's initial plea offer was twenty years, counsel successfully negotiated a fifteen-year sentence for a Class A felony.

Although counsel said that she was not familiar with *Phipps* specifically, counsel was not questioned about whether she understood the possible application of diminished capacity in the Defendant's case. In any event, counsel said that she and the Defendant discussed an insanity defense and that she attempted to use the Defendant's mental health as a defense but that he "had other drugs in his system" that would have "killed any type" of reliance on his mental health. Counsel said that if the case had proceeded to a trial, she would have relied on the mental health diagnoses, regardless of the competency determination, and would have attempted to "poke holes" in the prosecution's evidence. We note that the Defendant did not present favorable mental health evidence at the hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The record supports the trial court's determinations that counsel did not provide deficient performance and that the Defendant was not prejudiced by counsel's performance.

Because the record supports the trial court's determinations that the Defendant entered knowing and voluntary guilty pleas and that counsel did not provide ineffective assistance of counsel, we conclude that the *Phelps* factor related to the circumstances underlying the entry of the Defendant's guilty pleas weighs against granting the motion to withdraw his guilty pleas.

The trial court did not render findings relative to the Defendant's nature and background and his prior experience with the criminal justice system, and the information in the record relative to these factors is limited. The record reflects that the Defendant was approximately age twenty-eight at the time he entered his guilty pleas. On January 19, 2017, the trial court ordered a forensic evaluation at Pathways to determine whether the Defendant was competent to stand trial and to assess the Defendant's mental condition at the time of the offenses. On March 8, 2017, the trial court ordered that a second evaluation be conducted at Western, based upon the recommendation of the physicians at Pathways. The reports from these evaluations are not included in the appellate record.

However, at the motion hearing, the Defendant testified that, as a teenager, he was diagnosed with bipolar disorder with schizophrenic tendencies, that he had previously received in-patient treatment in Alabama and Connecticut, that his symptoms became worse after a car accident at age eighteen or nineteen, and that by age twenty-three he began receiving "signs from God." At the guilty plea hearing, counsel told the trial court that the Defendant had been diagnosed with multiple mental health disorders, that the Defendant had undergone two mental health evaluations since his arrest, and that the

-14-

physicians concluded the Defendant "was fine." The Defendant reported obtaining his GED, never having been in trouble before this case, and never having been violent toward others. The record does not contain a presentence report, but the judgments of conviction reflect that the Defendant pleaded guilty as a standard offender relative to the aggravated assault convictions. At the motion hearing, the Defendant testified that at the time of the offenses, he worked on roofs and voluntarily stopped taking Seroquel because the side effects interfered with his ability to work. On balance, the Defendant's nature and background weigh neither in favor nor against granting the Defendant's motion, but the Defendant's lack of criminal history weighs in favor of granting the Defendant's motion.

Last, we consider the potential prejudice to the State if the motion were granted to the extent that the Defendant's lack of prior experience with the criminal justice system may establish a fair and just reason for allowing the Defendant to withdraw his guilty pleas. *See Phelps*, 329 S.W.3d at 451 (stating that this factor is only relevant when a defendant establishes a "fair and just reason" granting the motion). The State did not address this factor at the motion hearing, and the trial court did not render any relevant findings in this regard. The prosecutor's argument focused on the Defendant's failure to establish manifest injustice, requiring the withdrawal of the Defendant's guilty pleas. The prosecutor argued that because the Defendant failed to show that his guilty pleas were involuntary and that he received ineffective assistance, the motion to withdraw should be denied. In any event, the evidence against the Defendant remains within the State's possession and available for a trial. Counsel testified at the motion hearing that the State's evidence showed that before the offenses, the Defendant purchased bleach and sheets and sharpened the knife used during the incident. This factor weighs neither in favor of nor against granting the Defendant's motion.

After consideration of the *Phelps* factors, we conclude that although the trial court failed to render findings on each factor, the trial court did not abuse its discretion by denying the Defendant's motion. The Defendant failed to establish a manifest injustice required withdrawal of his guilty pleas, and he is not entitled to relief. The judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE